USA v. Lambus

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2017

(Argued: February 20, 2018            Decided: July 25, 2018)

Docket No. 16-4296

_____

UNITED STATES OF AMERICA,

*Appellant,*

- v. -

KAMEL LAMBUS, AKA Kamel Angevine, AKA K, AKA Kamel
Angenevine, STANLEY FULLER, AKA Wardy, AKA Webo,

*Defendants-Appellees.*[*]

_____

Before: KEARSE and LIVINGSTON, *Circuit Judges*, and MEYER, *District Judge*[**].

---

[*]     The Clerk of Court is directed to amend the official caption to conform with the above.

[**]     Judge Jeffrey A. Meyer, of the United States District Court for the District of Connecticut, sitting by designation.

Appeal by the United States from so much of two pretrial orders of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, as (1) granted motions by defendants Kamel Lambus and Stanley Fuller to suppress evidence obtained pursuant to one of several court-authorized wiretaps, and (2) granted a motion by Lambus to suppress location data generated by a GPS tracking device attached to his ankle by his New York State parole officers. The district court ruled that the wiretap applicant had knowingly withheld from and misrepresented to the authorizing judge information that was required by 18 U.S.C. § 2518(1)(e), and the court suppressed the evidence gained from that wiretap, citing its inherent authority. *See* 221 F.Supp.3d 319 (2016). The court suppressed location data generated by the GPS device, ruling that Lambus's Fourth Amendment expectations of privacy were infringed on the ground that the device was used for a two-year period, without a warrant, not for purposes of State parole supervision but only for the collection of evidence that would permit the federal government to prosecute Lambus for drug trafficking. *See* 251 F.Supp.3d 470 (2017).

On appeal, the government challenges the suppression of the wiretap evidence, contending (a) that the district court clearly erred in finding that the mistakes by the wiretap applicant were intentional rather than inadvertent, and (b)

that the court did not find the applicant's mistakes to have been material, and it erred in failing to apply the test established by *Franks v. Delaware*, 438 U.S. 154 (1978), under which such evidence should not be suppressed unless the mistakes were material. The government challenges the suppression of GPS data, contending principally that (a) the GPS monitoring of Lambus was permissible because it was reasonably related to his parole officers' duties; (b) in light of Lambus's acknowledgements of his parole officers' authority to search his person and to attach a GPS tracker, evincing little expectation of privacy, the use of the tracker was not unreasonable under the Fourth Amendment; and (c) in any event, suppression should have been denied under the good-faith doctrine of *Davis v. United States*, 564 U.S. 229 (2011).

Finding merit in the government's contentions, we conclude that the district court erred in suppressing the wiretap evidence and the GPS data.

Reversed.

> MICHAEL P. ROBOTTI, Assistant United States Attorney, Brooklyn, New York (Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, David C. James, Lauren H. Elbert, Marcia M. Henry, Assistant United States Attorneys, on the brief, Brooklyn, New York), *for Appellant*.

RONALD RUBINSTEIN, New York, New York (Joseph R. Corozzo, Angela D. Lipsman, Rubinstein & Corozzo, New York, New York, on the brief), *for Defendant-Appellee Kamel Lambus*.

JAMES KOUSOUROS, New York, New York (Susan C. Wolfe, New York, New York, on the brief), *for Defendant-Appellee Stanley Fuller*.

Lindsay A. Lewis, New York, New York (National Association of Criminal Defense Lawyers, New York, New York; Michael C. Miller, Jeffrey Novack, Meghan Newcomer, David Hirsch, Steptoe & Johnson, New York, New York, of counsel; Timothy P. Murphy, New York State Association of Criminal Defense Lawyers, Albany, New York, of counsel), *filed a brief for Amici Curiae National Association of Criminal Defense Lawyers and New York State Association of Criminal Defense Lawyers in support of Defendants-Appellees*.

KEARSE, *Circuit Judge*:

The United States appeals pursuant to 18 U.S.C. § 3731 from so much of two orders of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, as (1) granted motions by defendants Kamel Lambus and

Stanley Fuller to suppress evidence obtained pursuant to one of several court-authorized wiretaps, and (2) granted a motion by Lambus to suppress location data--apparently reflected on maps on which dots pinpointed the presence of Lambus at the times indicated--directly obtained from a GPS tracking device attached to his ankle by his New York State (or "State") parole officers. The district court ruled that the wiretap applicant had knowingly withheld from and misrepresented to the authorizing judge information that was required by 18 U.S.C. § 2518(1)(e), and the court suppressed the evidence gained from that wiretap, citing its inherent authority. *See United States v. Lambus*, 221 F.Supp.3d 319 (E.D.N.Y. 2016) ("*Lambus I*"). The district court suppressed the location data generated by the GPS device, ruling that Lambus's Fourth Amendment expectations of privacy were infringed on the ground that the device was used for a two-year period, without a warrant, not for purposes of State parole supervision but only for the collection of sufficient evidence to permit the federal government to prosecute Lambus for drug trafficking. *See United States v. Lambus*, 251 F.Supp.3d 470 (E.D.N.Y. 2017) ("*Lambus II*").

On appeal, the government challenges the suppression of the wiretap evidence, contending (a) that the district court clearly erred in finding that the mistakes by the wiretap applicant were intentional rather than inadvertent, and (b)

5

that the court did not find the applicant's mistakes to have been material, and it erred in failing to apply the test established by *Franks v. Delaware*, 438 U.S. 154 (1978), under which such evidence should not be suppressed unless the mistakes were material. The government challenges the suppression of GPS data, contending principally that (a) the GPS monitoring of Lambus was permissible because it was reasonably related to his parole officers' duties; (b) in light of Lambus's acknowledgements of his parole officers' authority to search his person and to attach a GPS tracker, evincing little expectation of privacy, the use of the tracker was not unreasonable under the Fourth Amendment; and (c) in any event, suppression should have been denied under the good-faith doctrine of *Davis v. United States*, 564 U.S. 229 (2011).

Finding merit in the government's contentions, we reverse both decisions, concluding that the district court erred in suppressing the wiretap evidence and the GPS data.

## I. BACKGROUND

Lambus and Fuller are accused of being leaders and organizers of a group of individuals that referred to itself as the Paper Chasing Goons or POV City

6

and was a drug trafficking organization (or the "DTO"). Beginning in 2015, Lambus and Fuller, along with 10 others, were indicted principally on charges of conspiring to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, and/or possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841. The indictments followed investigations that dated back to mid-2012, after Lambus had been released from State prison, and that included controlled purchases of narcotics, physical and electronic surveillances of suspected sites of narcotics activity, subpoenas, pen registers, and several 2015 wiretaps on telephones associated with Lambus, Fuller, certain of the codefendants, and other suspected DTO members. The 10 codefendants have pleaded guilty to various charges; Lambus and Fuller remain to be tried.

In 2016, Lambus and Fuller moved to suppress all evidence obtained or resulting from five 2015 wiretap orders on the ground that the first wiretap application omitted certain material facts and contained misrepresentations of fact. In addition, Lambus moved to suppress all evidence obtained or resulting from the GPS tracking device attached to his ankle by his State parole officers from May 2013 to early July 2015, arguing that those officers impermissibly disclosed the resulting data to the federal government throughout its investigation leading to the present case.

The district court, as discussed in greater detail in Part I.B.1 below, granted defendants' motion to suppress evidence of statements intercepted pursuant to the first wiretap authorization, but not evidence obtained through the subsequent authorizations. As discussed in Parts I.B.2. and I.B.3. below, the court initially denied Lambus's motion to suppress GPS-related evidence; but it granted his motion for reconsideration and, upon reconsideration, granted the motion to suppress information obtained as a direct--but not as an indirect--result of the GPS device.

Two sets of evidentiary hearings were held with respect to the motions to suppress: the first in 2016 on the original motions, and the second in 2017 following Lambus's motion for reconsideration. The evidence at these hearings included the following, largely as described by the district court in its decisions, or as provided by a witness--Thomas Scanlon--whom the district court found "very credible" (Hearing Transcript, March 15, 2017 ("Mar. 15, 2017 Tr."), at 88; *id*. at 16 ("I consider you a highly credible witness")); *see Lambus I*, 221 F.Supp.3d at 337 ("The court finds Investigator Scanlon's testimony credible.").

A.  *Evidence at the Suppression Hearings*

1. *Lambus Becomes a Parolee*

Prior to 2012, Lambus had been convicted of several New York State crimes, including criminal possession of a controlled substance in the 5th degree, *see* N.Y. Penal L. § 220.06; attempted criminal possession of a controlled substance in the 5th degree, *see id.*, and in the 3rd degree, *see id*. § 220.39; and attempted criminal possession of a weapon in the 2nd degree, *see id*. § 265.03.  He had served prison terms and been subject to post-release supervision by the New York State Department of Corrections and Community Supervision ("NYSDOCCS" or "DOCCS").  Persons on post-release supervision are supervised by parole officers, are subject to the same conditions as those imposed on parolees, *see id*. § 70.45(3) ("conditions of post-release supervision" are required to be imposed "in the same manner and to the same extent as . . . [the] conditions . . . upon persons who are granted parole or conditional release"), and are referred to as "parolees" (*e.g.*, Hearing Transcript, December 1, 2016 ("2016 Tr."), at 58); *see generally Lambus I*, 221 F.Supp.3d 319 (passim).

On March 7, 2012, Lambus was released from prison and began a term of post-release supervision that was scheduled to end on August 2, 2015.  Before his release, Lambus had signed a Certificate of Release to Parole Supervision ("PRS

9

Certificate") that specified those two dates, and in which he stated, *inter alia*, as follows:

> I, Kamel Lambus, voluntarily accept Parole Post-Release supervision. *I fully understand that my person, residence and property are subject to search* and inspection. *I understand that Parole Post-Release Supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the Board of Parole or its representatives.* I understand that my violation of these conditions may result in the revocation of my release.

(Lambus's March 5, 2012 PRS Certificate (emphases added).) Lambus also stated his agreement to numerous specified conditions, including the following:

> 4. *I will permit . . . the search* and inspection *of my person,* residence and property. . . .
>
> . . . .
>
> 7. I will not be in the company of or fraternize with any person I know to have a criminal record . . . except for accidental encounters in public places, work, school or in any other instance with the permission of my Parole Officer.
>
> 8. *I will not behave in such manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment,* nor will my behavior threaten the safety or well-being of myself or others.
>
> 9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer. . . .

. . . .

12. . . . . I will abide by a curfew established by the P[arole] O[fficer].

13. *I will fully comply with the instructions of my Parole Officer and obey such special additional written conditions as he or she . . . may impose*.

(Lambus's March 5, 2012 PRS Certificate ¶¶ 4, 7-9, 12, 13 (emphases added).)

In June 2012, Lambus sent a letter ("Lambus Letter" or "Letter") to Christopher Jones, who was still an inmate at the State correctional facility from which Lambus had been released in March. The Letter, which enclosed photographs that showed, *inter alia*, Lambus with large amounts of cash and with persons making gang-related signs, was intercepted by DOCCS's Office of the Inspector General ("IG"--now called Office of Special Investigations), and the IG referred the Letter to the parole bureau that was then supervising Lambus. That bureau in July referred the Letter to DOCCS's Bureau of Special Services ("BSS"--now called Community Supervision, Operations Center), whose function was to investigate criminal activity that had a nexus to a particular parolee. At BSS, the Lambus Letter was assigned to Scanlon, who was then an investigating parole officer.

11

Scanlon testified that, in accordance with the NYSDOCCS Parole Handbook (or "Handbook"), State parole officers are responsible not only for providing parolees with counseling and other assistance in adjusting to life after release from imprisonment but also for "ensur[ing] that individuals under parole supervision are obeying the laws of society and the rules of parole." (Mar. 15, 2017 Tr. 32.) Scanlon's duties as a parole investigator included "conduct[ing] threat assessment investigations, any threat to the community," and "investigat[ing] individuals that are under supervision that may be involved in criminal activity beyond what a bureau would be capable of investigating," in order to "uncover the *full scope of a parole violation*," which would encompass "drug possession . . . . [and/or] drug trafficking by a parolee." (*Id*. at 31-32 (emphasis added).)

Scanlon testified that he interpreted the IG-intercepted Lambus Letter as referring to narcotics and gang activity, and in particular as indicating, *inter alia*, that Jones had narcotics that Lambus wanted to buy. In August 2012, Scanlon contacted a BSS investigator who was assigned to a United States Drug Enforcement Administration ("DEA") task force. He was informed that the DEA task force had been investigating Lambus. But finding no evidence that Lambus was supplying narcotics in the prison facility, the DEA task force terminated its investigation of Lambus in September or October 2012.

Scanlon nonetheless suspected, in light of Lambus's history of narcotics dealing and his Letter, that Lambus was probably again engaged actively in the distribution of narcotics. He attempted to determine the source of the inordinately large sums of money shown in the pictures sent with the Lambus Letter.

Lambus, upon his release from prison, resided in an area of Queens County managed by DOCCS's "Queens II Bureau" where he was supervised by Parole Officer (or "P.O.") Trudy Kovics and Supervising Parole Officer (or "S.P.O.") Hubert Browne. Scanlon discussed the Lambus Letter with Kovics and informed her of the negative results of the DEA task force's investigation into whether Lambus was sending drugs into the prison facility. Kovics said she had experienced no problems with Lambus, and she speculated that in the photographs Lambus was posing with bills that were counterfeit.

Scanlon doubted that the money was counterfeit and proceeded for the next several months to attempt to identify the persons shown with Lambus in the photographs and the places Lambus was frequenting. He conducted surveillances of Lambus's residences and places of employment. Although at some point Lambus claimed to hold two jobs, he reported earning just $200 per week; such wages could not account for the mounds of money with which Lambus was photographed. Nor

13

was it clear that he actually held the jobs he claimed: During Scanlon's numerous surveillances, Lambus never appeared for work at the times or on the dates he was supposedly working.

In February 2013, Lambus moved to an area of Queens in which he was supervised by DOCCS's "Queens III Bureau." On March 17, his new parole officer found that he was not at home for his curfew. On April 5, Scanlon sent an email to the Queens III Bureau Chief, to a Queens III Bureau S.P.O., and to Scanlon's own BSS supervisor ("Scanlon April 5, 2013 Email") to provide an interim update on his investigation of Lambus for possible violations of the conditions of his release. That email stated, *inter alia*, that "Lambus's employment and residence are suspect," and that Lambus's Letter, his history of narcotics distribution, and "his recent changes in residence when his PO obtains curfew violations" indicate that he may be violating his release conditions. (Scanlon April 5, 2013 Email at 2.) It noted that BSS would assist Queens III Bureau with respect to a search of Lambus's residence and appropriate follow-up measures.

On April 9, 2013, several Queens III Bureau parole officers searched areas of Lambus's residence. In an ashtray in the living room area, they found remnants of marijuana cigarettes. Lambus claimed none of them belonged to him. Shortly after

14

that search, Lambus moved back to the area managed by Queens II Bureau. P.O. Kovics resumed responsibility for his direct supervision.

2. *Queens II Bureau Places Lambus on GPS Monitoring*

On or about May 2, 2013, an anonymous email was sent to the NYSDOCCS website, "complain[ing] about a person on parole"--to wit, "Kamel Lambus." The email stated that

> Mr. Lambus is currently still selling drugs. He is driving around in a . . . 6000 Audi with no job. Mr. Lambus is also having a party on May 5th at Club Allure from 4:00 pm to 10:00 pm. He also r[uns] with a crew . . . by the name of PCG Pov City Goons, Paper Chasing Goons. There are plenty of videos with him in it with guns, money, et cetera. Also the house he is living in they sell drugs out of the back of the apartment. Please keep this anonymous and forward to his parole officer T. Kovics diversion[sic] Queens.

(2016 Tr. 94-95 (anonymous email as read by Scanlon).) On May 5, during the time of Lambus's predicted party, Kovics, at the direction of Queens II Bureau Chief Mark Parker, conducted a curfew check at Lambus's residence. Lambus was not there.

On May 6, Parker and S.P.O. Browne decided that on May 8, during Lambus's next scheduled visit to the parole office, Lambus would be placed on GPS monitoring. Scanlon testified that DOCCS procedures for supervision of recalcitrant

15

parolees, short of returning them to prison, included "graduated sanctions" such as "electronic monitoring" (Mar. 15, 2017 Tr. 11); parole officials were instructed that such GPS monitoring could properly be imposed without court orders because of parolees' "diminished expectation of fourth amendment rights" (*id.* at 13).

Browne testified that the decision to place Lambus on GPS monitoring was based "*primari[ly]*" on Lambus's curfew violations (*see* Hearing Transcript, April 11, 2017 ("Apr. 11, 2017 Tr."), at 133 (emphasis added); *see also id.* at 113 ("a curfew violation and . . . a report of illegal activities in the residence")), but that "[i]n addition to the curfew violation, allegations of drug dealings came up too, and the [May 5] party was supposed to happen in the club. All of those factors played into placing him on electronic monitoring" (*id.* at 135).

Thus, on May 8, 2013, a GPS tracking device was attached to Lambus's ankle. According to Lambus's March 5, 2012 PRS Certificate, his post-release-supervision period was to end on August 2, 2015. (*See also* Affidavit of Kamel Lambus dated April 14, 2016, in support of his suppression motion ("Lambus Aff."), ¶ 28 ("My term of post-release supervisors [*sic*] was scheduled to end on August 2, 2015.").) On May 8, 2013, Lambus signed forms acknowledging that GPS monitoring was being imposed as a special condition of his release and that the monitoring

16

would "*remain in effect until the termination of my legal period of supervision . . . [u]nless otherwise amended in writing by the Division of Parole.*" (Lambus's Special Conditions/GPS Monitoring Form, signed May 8, 2013, at 1 (emphases added); *see also id.* at 4, ¶ 7 ("I will not tamper with the transmitter on my person [or] the monitor"); *id.* at 4, ¶ 3 ("*I agree to wear the transmitter on my person and to keep the monitor plugged into and attached to my telephone,* and to do both *for twenty-four hours a day, seven days a week,* during the period of my participation in the program." (emphases added)).)

Lambus's affidavit in support of suppression explained his acceptance of GPS monitoring as follows:

> 14. Parker advise[d] me in sum and substance that he would violate me and send me back upstate to prison unless I agreed to have a GPS ankle bracelet installed on me.

> 15. Based on the choice between those two options, I signed the consent form and allowed them to put the GPS location monitoring bracelet on my person that day.

> . . . .

> 25. I only signed the consent form to put the GPS ankle monitor on me because I feared being sent back to prison.

(Lambus Aff. ¶¶ 14-15, 25.)

17

BSS had not been forewarned of Queens II Bureau's intention to place Lambus on GPS monitoring. Scanlon learned of it only when Kovics called him on May 8 and informed him that it had been done "because of [Lambus's] curfew violation." (2016 Tr. 98.) Scanlon's initial reaction to the GPS monitoring was somewhat negative because he thought it could compromise his investigation by making Lambus more circumspect and thereby making his criminal activity more difficult to detect and prove. A year later, however, Scanlon would recommend that the monitoring be continued because it was in fact assisting his investigation. (*See* Parts I.A.3. and I.A.4. below.)

3. *Scanlon Seeks Federal Assistance*

From the fall of 2012--when the DEA task force terminated its investigation into whether Lambus was sending drugs into prison--until early June 2013, no federal agencies were involved in the investigation of Lambus by BSS. The May 2013 decision to place the tracking device on Lambus had been made solely by members of Queens II Bureau, not at the behest the federal government, and indeed without any input or foreknowledge by BSS.

18

Once the GPS tracker was installed, only Queens II Bureau and BSS had independent access to the GPS data. Those data aided Scanlon's investigative efforts by identifying places that Lambus was frequenting, allowing surveillances in promising areas. As a result, Scanlon got confirmation that Lambus was, *inter alia*, associating with known felons, frequenting known stash houses, and attempting to obtain a weapon. Lambus was also wearing gang colors, and he was found in possession of an unexplained amount of cash. Scanlon was persuaded that Lambus was not adhering to the conditions of his release, and it appeared that Lambus was a high-ranking member of the DTO. But Scanlon doubted that he had enough evidence to have Lambus returned to prison for parole violations.

Scanlon testified that BSS had limited resources; and as he began to fathom "the apparent scope of [Lambus's] involvement" in the DTO, he realized that he "needed assistance to investigate the case further" (Hearing Transcript, March 17, 2017 ("Mar. 17, 2017 Tr."), at 141), in the form of "additional manpower" and "funding . . . to assist us in identifying the whole crew and pursuing the investigation to dismantle that crew" (2016 Tr. 106). Such personnel identifications were important because it was part of Scanlon's job to determine whether other DTO members were also parolees; and dismantling "the rest of Mr. Lambus'[s] criminal organization" was important to "public safety." (Mar. 17, 2017 Tr. 145.)

Accordingly, in early June 2013, Scanlon called Special Agent Steve Lee at the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). This was Scanlon's first Lambus-related contact with federal law enforcement agents in 2013. In mid-June, Scanlon met with Special Agent Christopher Popolow of Homeland Security Investigations ("HSI"), a branch of ICE. Scanlon described the information that BSS's investigation had developed with regard to Lambus, several other identified individuals, and their apparent narcotics trafficking activity. Scanlon testified that HSI "agreed to assist us with the case." (2016 Tr. 106.)

Scanlon testified that HSI was designated the lead agency because it supplied, *inter alia*, manpower, undercover agents, and money for controlled purchases (*see id*. at 107; Mar. 17, 2017 Tr. 143); but BSS shared control of the investigation (*see id*.). GPS monitoring data provided starting points for surveillances, but the federal agents had no direct access to those data. Scanlon passed the GPS data to members of the joint investigation.

Scanlon "was one of the lead investigators on the team" (*id*. at 170) and was "considered one of the lead case agents" (*id*. at 142). The federal agents did not give Scanlon instructions, and he did not give instructions to them. Scanlon took

investigative steps on his own initiative. He also had strategy meetings with the federal agents and "would request certain activities be performed, such as surveillance, request for pole cameras." (*Id*.) When actions were agreed upon, Popolow, the other lead agent in the first year of the joint investigation, would typically deploy the federal personnel.

In August of 2014, HSI and BSS contacted the DEA, and three DEA agents--who were also working on other cases--joined the investigation of Lambus. (*See, e.g.*, Apr. 11, 2017 Tr. 178; *see also* Mar. 17, 2017 Tr. 200 (still later, they were joined by agents of the Federal Bureau of Investigation ("FBI")).) DEA Special Agent Gerald Russell testified that Scanlon was "a key member of the [Lambus-investigation] group" (Apr. 11, 2017 Tr. 202); he was "the leader from [the NYSDOCCS] side, working jointly with the leaders from [HSI] and the DEA" and "help[ed] in drawing up the plan" (*id*. at 225, 198). In addition to providing the rest of the team with data from the GPS monitoring device, Scanlon participated in surveillances, attended controlled drug purchases, monitored wiretaps, and participated in meetings. (*See id*. at 188, 201-02, 205, 222; *see also id*. at 226 (Scanlon "provided a great deal of intel, so he assumed a role of a leader, . . . sharing all of that kind of data amongst the agencies involved").)

21

### 4. *Lambus's GPS Monitoring Is Continued Until Mid-2015*

Lambus states that he "never agreed that the GPS device would remain on [him] indefinitely" (Lambus Aff. ¶ 26); and there is no dispute that, after a few months, he "repeatedly asked" to have the device removed (*id*. ¶ 18; *see* Hearing Transcript, April 10, 2017 ("Apr. 10, 2017 Tr."), at 96). S.P.O. Browne testified that his understanding was that Lambus would be on GPS monitoring for a "minimum" of six months, which was the normal minimum for non-sex offenders, and that such monitoring would seldom end on the originally scheduled date. (*E.g.*, Apr. 11, 2017 Tr. 153-54, 160-61, 167.) Bureau Chief Parker indicated that he likely told Lambus that the need for GPS monitoring would be reevaluated in three-to-six months.

Despite Lambus's repeated requests for the GPS tracker's removal, he was subjected to GPS monitoring until July 2015, *i.e.*, for more than two years. Browne testified that at some point during that period it was his view that that monitoring should end. However, Parker--who had authority to terminate the monitoring--had received a memorandum from the BSS bureau chief in early July 2013, requesting that BSS be informed and consulted with respect to changes in Lambus's supervision (*see* Apr. 10, 2017 Tr. 101-02). The memorandum stated as follows:

"Please note that the *BSS continues* to actively investigate the [Lambus] case. *To date this investigation has pointed towards his involvement in a significant Narcotics operation, the scope of which has not yet been determined. The BSS is now working closely with ICE and a protracted investigation is expected.* This memo is considered strictly confidential and all measures should be taken to prevent our Target from knowledge of this investigation. *It is further requested that any change in his supervision program be communicated to the BSS and that BSS be consulted prior to any consideration of revocation.*"

*Lambus II*, 251 F.Supp.3d at 485 (quoting July 2, 2013 memorandum to Parker from BSS Bureau Chief James Shapiro (emphases ours)).

Scanlon testified that DOCCS is not required to "violate" a parolee--*i.e.*, to initiate violation proceedings against him--for "every" violation; and the most likely punishment for a minor violation "such as a curfew violation or possession of marijuana" would be "just a verbal admonishment." (Mar. 17, 2017 Tr. 139-140.) In Scanlon's view, imposition of such punishment on Lambus for a minor violation would not have deterred Lambus from continuing to engage in drug trafficking. (*See id*. at 140.) Thus, "[d]uring the course of GPS monitoring," Scanlon asked Lambus's "parole officer not to initiate violation proceedings for minor violations" because "[a]t that point we were trying to determine the broader scope of his involvement with drug trafficking and . . . I was concerned that if we violated him on minor violations,

23

we would compromise the investigation and not have defined his role in the entirety."
(*Id*. at 139.)

Scanlon also testified that although he periodically gave Parker general updates on the BSS/HSI investigation, he shared only limited details because he had become wary of alerting Lambus. (*See* Mar. 17, 2017 Tr. 148-49.) For example, prior to May 2013, Scanlon had been able to get information about Lambus's activities through his social media pages; but Lambus, learning that certain of his posts had come to Parker's attention, promptly curtailed his use of such pages, thereby closing a useful investigative avenue. (*See* Mar. 15, 2017 Tr. 40-41.)

In the spring of 2014, when Parker was considering ending Lambus's GPS monitoring, he consulted with BSS, with the DOCCS regional director, and with DOCCS Deputy Commissioner Thomas Herzog, as to whether to do so. Scanlon testified that he recommended that the GPS monitoring of Lambus be continued. While in most cases six months would be a sufficient monitoring period, "individuals that [BSS] deems as high risk in the community . . . . would stay on [monitoring] *indefinitely*, until *the maximum*." (Mar. 15, 2017 Tr. 15 (emphases added).) Scanlon viewed Lambus as a high risk parolee in this respect because of his "[g]ang involvement, his past history, and his apparent level of narcotics trafficking." (*Id*.)

24

However, at that time, Scanlon did not believe DOCCS had sufficient evidence to prove a major parole violation; indeed, in his view, the investigators did not obtain such evidence until they listened to wiretaps in 2015. (*See id*. at 122-23; *id*. at 123 (the pre-wiretap evidence "raised [Scanlon's] suspicions that [Lambus] was engaging in drug trafficking," but Scanlon "did not have sufficient evidence to prove a violation of parole").) In December 2013, Scanlon and Popolow had met with an Assistant United States Attorney ("AUSA") to discuss their investigation and were informed that their evidence "didn't meet the threshold" for federal prosecution. *Lambus II*, 251 F.Supp.3d at 479 (internal quotation marks omitted). Scanlon testified that it would be many months before it was determined that there would be a federal prosecution.

"After being told" by an AUSA in December 2013 "that the federal prosecutors would consider prosecution only if the investigation turned up 'evidence of more drugs [and] more weight,' the investigators did not inquire whether a state prosecution would be possible . . . ." *Lambus II*, 251 F.Supp.3d at 479 (quoting Mar. 17, 2017 Tr. 209). Scanlon testified that, after reviewing the evidence indicating that "previous State incarcerations did not deter Mr. Lambus from continuing in his drug distribution ring," and after speaking with his BSS supervisors and DOCCS Deputy Commissioner Herzog, Scanlon "thought federal prosecution along with the[] [more

25

severe] penalties would be the best outcome to stop this behavior." (Mar. 17, 2017 Tr. 147, 156.) Accordingly, Scanlon's recommendation to Parker in the spring of 2014 was to continue the GPS monitoring of Lambus for the duration of the joint BSS-HSI investigation, based on Scanlon's DOCCS training and existing DOCCS protocols (*see* Mar. 15, 2017 Tr. 45), and based on evidence that Lambus had persisted in ignoring curfews, was associating with known felons, and appeared to be a leader of the narcotics activity--and that Lambus "was tampering with the GPS" (*id*. at 44).

Parker decided to continue the GPS monitoring of Lambus based on the recommendations of BSS, and of the regional director and Deputy Commissioner Herzog--Parker's "higher up[s]" in NYSDOCCS. (Apr. 10, 2017 Tr. 97.) Federal agents never made any recommendation to Scanlon as to whether GPS monitoring should continue. The GPS tracker remained on Lambus until he was arrested on the present federal charges in July 2015.

5. *Federal Agents Request Authorization for Wiretaps*

In the meantime, in early 2015, it was decided that federal court authorizations for wiretaps would be sought to assist the investigation of the DTO. Eventually, five wiretap applications were made; all were granted.

An affidavit in support of the first application was prepared on January 9, 2015 ("First Wiretap Affidavit") by an HSI agent to whom we refer as the "HSI Agent" (the name being undisclosed here, as it was redacted in the district court, *see*, *e.g.*, *Lambus I*, 221 F.Supp.3d at 327-31). The First Wiretap Affidavit requested authorization to intercept, for up to 30 days, telephone calls and text message transmissions to and from a certain number ending in 5283 (the "5283 telephone" or "subject telephone"), for a mobile telephone known to be used by one of the targets of the proposed wiretap. The law enforcement officers had learned of that number from a confidential informant ("CI") who had been found credible and reliable, some of his information having been corroborated by subsequent narcotics seizures.

The First Wiretap Affidavit stated that HSI agents and other law enforcement officers were investigating numerous persons for narcotics and firearms offenses, including distribution of controlled substances and conspiracy to do so, use of firearms in furtherance of those offenses, and dealing in firearms. It defined as wiretap "Target Subjects" a dozen persons including Lambus and Fuller and stated that the drug trafficking organization also included other persons whom law enforcement had not been able to identify.

27

The HSI Agent stated that the affidavit was based on, *inter alia*: personal participation in the investigation of the offenses referred to; reports by other special agents; information received from the CI; reports of physical surveillances conducted between July 17, 2013, and November 21, 2014, which identified stash houses; consensually intercepted wire communications; controlled purchases by the CI from suspected members of the DTO; and the seizure, during a judicially authorized search, of cocaine base and drug paraphernalia from a residence at which Lambus and two other wiretap targets were present.

The affidavit described various other investigative techniques the officers involved in the investigation had used or attempted in the past. They included, in addition to the methods referred to above, other judicially-issued search warrants; analysis of toll records; pen registers for telephones that had contact with the 5283 telephone and that were used by known narcotics traffickers; use of pole cameras; and subpoenas to financial and penal institutions in an effort to locate documentary evidence. The HSI Agent stated that those methods had not proven effective in determining the extent of the DTO or the identity of its suppliers; further, it was unlikely that the CI or undercover officers would be able to penetrate more deeply into the drug trafficking organization, given that such organizations tend to be

compartmentalized and that the members of the DTO, wary of law enforcement, were reluctant to do business with persons other than trusted associates.

In a section of the First Wiretap Affidavit titled "Prior Applications," the HSI Agent also stated as follows:

> As of December 22, 2014, a check of federal law enforcement databases, including FBI, DEA, ATF, and HSI databases, indicate [*sic*] that *there have been no prior applications seeking Court authorization to intercept the wire, oral, or electronic communications of the Target Subjects or over the SUBJECT TELEPHONE.*

(Emphasis added.)  This statement, however, was not true.

As the HSI Agent's affidavits in pursuit of the next wiretap authorizations revealed, prior to January 9, 2015, there had in fact been several wiretap applications leading to orders authorizing interception of communications of some persons identified as wiretap targets in the First Wiretap Affidavit.  The orders included a total of four authorizations in 2011 with regard to Fuller and one other Target Subject; an order in 2003 with regard to a third Target Subject; and two orders in 2004 with regard to an individual who was not literally a Target Subject as that term was defined in the First Wiretap Affidavit but who was listed in that affidavit's subsequent description of "Targets."

The HSI Agent who authored the First Wiretap Affidavit--and who had requested the check of the federal law enforcement databases referred to in its "Prior Applications" section--testified at the 2016 suppression hearing that the error in that section of the First Wiretap Affidavit resulted from a flawed request on the electronic surveillance ("ELSUR") form that was submitted to request the database checks. The HSI Agent testified that instead of listing on the ELSUR form all of the wiretap targets later named in the First Wiretap Affidavit, "I put in [on the ELSUR form] who I expected to actually intercept on that phone" (2016 Tr. 161), and that in stating that the databases had been searched with respect to all of the individuals named in the affidavit, "I misunderstood what I was saying" (*id*. at 157).

In preparing an affidavit to support the second wiretap application, the HSI Agent learned from an AUSA that the "Prior Applications" statement in the First Wiretap Affidavit was inaccurate. Thus, the errors were not repeated in connection with the second and subsequent wiretap applications. New ELSUR requests were completed, and all known prior applications with respect to all identified targets were listed in the affidavits that were submitted in support of those later applications.

The HSI Agent testified that the initial errors had not been intentional:

> THE COURT: Did you do that deliberately to mislead the Judge?
>
> THE WITNESS: No, sir.
>
> THE COURT: How did you know to correct it?
>
> THE WITNESS: I believe after we went to put the second wire affidavit together, I discussed it with the AUSA at the time and he was . . . like, no, you did it wrong the first time.

(2016 Tr. 160.)

> THE COURT: Did you do that deliberately [in your first submission] to [then-Judge] Gleeson?
>
> THE WITNESS: No, sir.
>
> THE COURT: Did you correct it with the next application?
>
> THE WITNESS: I believe I did, sir, yes.
>
> . . . .
>
> THE COURT: This hearing is closed.
>
> [Fuller's Attorney]: Well, Judge--
>
> THE COURT: I don't want to go over what is obviously an error on his part. Whether that's sufficient to suppress is a matter you will brief.

31

(*Id*. at 164-65.) The court indicated, however, that it was inclined to grant at least that aspect of the motions to suppress:

> THE COURT: . . . . When I get an application coming before me, I have to have *absolute* reliance on the fact that the affidavits are as *carefully* made out as possible.
>
> Here *they were done carelessly*, I don't say that critically, by an experienced man. Whatever you got from that wiretap is not coming in. It's going to be suppressed. Because I am not convinced that [then-Judge] Gleeson would have signed it if he knew this. Brief it and be prepared to try the case without that material.

(*Id*. at 166 (emphases added).)

B. *The District Court's Decisions*

Following the hearings in 2016, the district court in *Lambus I*, granted defendants' suppression motions only to the extent of excluding conversations intercepted pursuant to the first wiretap authorization. Eventually, in *Lambus II*, the court also partially granted Lambus's motion to exclude GPS-related evidence.

1. *Suppression as to the January 9 Wiretap Authorization*

In *Lambus I*, the district court found that the HSI Agent's error in the First Wiretap Affidavit's description of prior applications with respect to Target Subjects

was not inadvertent; and in the exercise of supervisory authority, the court precluded the government from introducing evidence of conversations intercepted pursuant to the January 9, 2015 wiretap authorization.

The court observed that the federal wiretap statute requires, *inter alia*, as follows:

> "Each application shall include the following information: [. . .] (e) *a full and complete statement of the facts concerning all previous applications* known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or place specified in the application, and the action taken by the judge on each such application."

*Lambus I*, 221 F.Supp.3d at 328 (quoting 18 U.S.C. § 2518(1)(e) (emphasis in *Lambus I*)). The court also noted that this Court in *United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ("*Rajaratnam*"), *cert. denied*, 134 S. Ct. 2820 (2014), had held it appropriate to apply the *Franks v. Delaware* standard in deciding a suppression motion based on errors in an application for a wiretap authorization:

> "Under *Franks [v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)] and its progeny, if a search warrant contains a false statement or omission, and the defendant makes a substantial preliminary showing (1) that the false statement or omission was knowingly and intentionally, or with reckless disregard for the

truth, included by the government in a search warrant affidavit, (2) that the information was material, and (3) that *with the affidavit's false or omitted material aside, the affidavit's remaining content is insufficient to establish probable cause*, then the fruits of the search must be suppressed." *United States v. Bianco*, 998 F.2d 1112, 1125 (2d Cir. 1993) (citing *Franks*, 438 U.S. at 155-56, 98 S.Ct. 2674) (emphasis added). "[T]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." [*Rajaratnam*, 719 F.3d] at 146 (internal quotation marks omitted).

*Lambus I*, 221 F.Supp.3d at 331-32.

Discussing the federal wiretap statute's "own exclusionary rule," which had been addressed in *United States v. Giordano*, 416 U.S. 505 (1974), the district court noted that the statute

provides that no intercepted communications can be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter. 18 U.S.C. § 2515. The specific grounds for exclusion . . . . are that: (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. § 2518(10)(a). . . . *Only violations of statutory requirements that "play[] a substantive role with respect to judicial authorization of intercept orders and consequently impose[] a limitation on the use of intercept procedures" require suppression. United States v. Donovan*,

34

429 U.S. 413, 435, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) (internal quotation marks omitted). The *Donovan* court's holding was limited to cases where the defective affidavit was only "unlawfully made" inadvertently.

*Lambus I*, 221 F.Supp.3d at 332 (other internal quotation marks omitted) (emphasis ours).

Notwithstanding the grounds for exclusion specified in the wiretap statute and the standards stated in *Franks* and its progeny, the court stated that "[t]he specific grounds stated above do not divest the court of its 'inherent authority to regulate the administration of criminal justice among the parties before the bar' through its general suppression powers." *Id*. at 332 (quoting *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980) (citing *McNabb v. United States*, 318 U.S. 332, (1943))).

"Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by willful disobedience of the law." *United States v. Payner*, 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (internal quotation marks and emphasis omitted). "The inherent supervisory power serves to ensure that the courts do not lend a judicial imprimatur to any aspect of a criminal proceeding that smacks of lawlessness or impropriety." *United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161, at *6 (E.D.N.Y. July 1, 2013). "The courts have wielded this authority substantively, that is, to provide a remedy for the violation of a recognized right of a

criminal defendant." *Id*. at *4 (citing cases). . . . *See[ also] Elkins v. United States*, 364 U.S. 206, 222-24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (holding that "the imperative of judicial integrity" requires illegally gathered evidence to be suppressed).

*Lambus I*, 221 F.Supp.3d at 332-33.  Still, the court had noted that

> [e]xclusion of the fruits of an unconstitutional search is not required in every case.  "For exclusion to be appropriate, *the deterrence benefits of suppression must outweigh its heavy costs*." . . . . "[T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." . . . . "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force." . . . . "[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."

*Id*. at 331 (quoting *Davis v. United States*, 564 U.S. at 237, 238, 232 (emphasis in *Lambus I*)).

The court ultimately found pertinent two pre-*Rajaratnam* decisions:

> In *Bianco*, the Court of Appeals held that a violation of section [2518](1)(e) is "subject to the statutory exclusionary provisions of [18 U.S.C.] §§ 2515 and 2518(10); that subsection (1)(e) constitutes a non-central provision of Title III; that the government's failure to comply with the requirements of subsection (1)(e) was in good faith and inadvertent error, and suppression is neither permissible [n]or appropriate."  998 F.2d at 1128 (internal citation omitted).  The court rested its decision to affirm the denial on the fact that the "omission of the prior surveillance applications" was "inadvertent" and the issue of "the

36

requirements of subsection (1)(e) as applied to a roving intercept application had not been addressed in any reported decisions" prior to the submission of the wiretap application. *Id.* Similarly, in *United States v. Barnes*, the defendant argued that "the government's failure to disclose the existence of concurrent state wiretaps (which, in part, targeted Barnes) requires suppression of the evidence obtained from the federal wiretaps." 411 Fed.Appx. 365, 368 (2d Cir. 2011). The court noted that "nothing in the record suggests that the government's affiant was aware of the state wiretaps, which were applied for after the state and federal investigations were severed." *Id.* The court held that defendant's mere speculation that the federal government must have been aware of the state wiretaps "is insufficient to demonstrate a knowing omission on the part of the government. Thus, the affiant's omission 'was not intentional, but inadvertent' and does not violate § 2518(1)(e)." *Id.* (quoting *Bianco*, 998 F.2d at 1128).

A natural implication of *Bianco* and *Barnes* is that section 2518(1)(e) of the wiretap statute is violated by the government's "knowing," non-inadvertent omission. Where the government knowingly omits information in violation of Title III's statutory requirements, suppression is appropriate.

*Lambus I*, 221 F.Supp.3d at 345.

The court found that the HSI Agent's truncated list of persons for whom the ELSUR search was to be made was knowing and non-inadvertent. In the First Wiretap Affidavit, submitted on January 9, 2015,

the Special Agent wrongly stated: "As of December 22, 2014, a check of federal law enforcement databases, including FBI, DEA, ATF, and HSI databases, indicate that *there have been no prior*

*applications seeking Court authorization to intercept the wire, oral, or electronic communications of the Target Subjects* or over the SUBJECT TELEPHONE."

*Id*. at 328 (emphasis in *Lambus I*).

On February 12, 2015, Special Agent [REDACTED] applied for a wiretap authorization for two more telephones believed to be associated with the DTO . . . . The affidavit was largely the same as the previous affidavit, with a few notable additions. Whereas in the prior affidavit, Special Agent [REDACTED] had averred that "[a]s of December 22, 2014 a check of federal law enforcement databases . . . indicate that *there have been no prior applications* seeking Court authorization to intercept the wire, oral, or electronic communications of the Target Subjects" . . . a check of those same databases on January 29, 2015 *revealed four prior authorizations*, from 2003 to 2011, that the government had obtained to intercept the communications of some of the Target Subjects. . . .

When questioned about this discrepancy at the suppression hearing before this court, the Special Agent conceded that Paragraph 24 of the January 9 Affidavit was "absolutely wrong." . . . . He testified that he checked the databases, "but not for the full set of names . . . it was a couple names. It was not the entire target list." . . . . The Special Agent apparently "misunderstood" what he was saying in the affidavit . . . , and before he submitted an affidavit in connection with the second wiretap application, an AUSA told him that he "did it wrong the first time."

*Id*. at 330 (brackets and emphases in *Lambus I*).

The court found that "the omission was not 'inadvertent;' it was knowing":

> The Special Agent testified that despite having been an affiant in previous wiretap applications . . . , he did not know that he needed to check for prior wiretap applications related to all the target interceptees. . . . This mistake alone, despite precedent to the contrary, *may* have constituted mere inadvertence. But this was not the Special Agent's only error. The HSI agent swore that "a check of federal law enforcement databases, including FBI, DEA, ATF, and HSI databases, indicate that there have been no prior application seeking Court authorization to intercept the wire, oral, or electronic communications of the *Target Subjects* or over the SUBJECT TELEPHONE." [First Wiretap Affidavit] at ¶ 24 (emphasis added). When he swore to this statement, he knew it was false. This was not a "misunderstanding." . . . . It was perjury.

*Id*. at 346 (emphases in *Lambus I*).

Concluding that "[s]uppression is an appropriate remedy for such an omission," the court stated that it

> need not rely on *Franks* or *Giordano* to rule that any evidence gathered pursuant to the January 9, 2015 wiretap order is suppressed. *It is within the court's inherent authority to suppress evidence gathered unlawfully in order to maintain the integrity of its own proceedings and of government affiants appearing before it-- particular[ly] in an in-chambers appearance without opposing counsel present. See, e.g., Elkins*, 364 U.S. at 222-24, 80 S.Ct. 1437; *see also Payner*, 447 U.S. at 735 n. 7, 100 S.Ct. 2439; *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608; *Cortina*, 630 F.2d at 1214; *HSBC Bank USA, NA.*, 2013 WL 3306161 at *4-6.

39

Wiretap applications are made *ex parte*. Judges rely on the absolute fidelity of the government agents and prosecutors who swear to affidavits and answer questions before the court in chambers attesting to the facts necessary to obtain a wiretap. In reliance on their fidelity, courts almost always grant their requests. See Wiretap Report 2015, *available at* http://www.uscourts.gov/statistics-reports/wiretap-report-2015 (in 2015 all [4,148] wiretap applications made pursuant to federal and state law were granted). *Knowingly false* statements cannot be tolerated, especially if those statements are made at proceedings where the courts have little choice but to take the government at its word. Any evidence of statements made on wiretaps gathered pursuant to the January 9, 2015 wiretap order is suppressed.

*Lambus I*, 221 F.Supp.3d at 346 (emphases added).

2.   *The Initial Denial of the Motion To Suppress GPS-Related Data*

In *Lambus I*, the district court denied Lambus's motion to suppress any evidence obtained from or derived from the GPS monitoring device attached to his ankle. While noting that the device had been attached initially for the proper purpose of monitoring whether Lambus was abiding by his curfew, the court plainly disapproved of NYSDOCCS' subjecting Lambus to such monitoring for more than two years; it viewed NYSDOCCS officers, after the GPS tracker had been attached for a month, as failing to perform their parole supervisory functions; and it condemned

federal officers' participation in the investigation of Lambus while knowing of the GPS monitoring and failing to seek and obtain a judicial warrant for its use in the criminal investigation. The court noted that

> in the instant case, coordination by the agencies unwittingly turned Lambus [*sic*] into a stalking horse for the federal agencies. Lambus knowingly had a GPS tracking device placed on his ankle on May 8, 2013, not because he was expected [*sic*] of any criminal wrongdoing, but to monitor whether he was abiding by the curfew condition of his parole.... This purpose shifted as federal law enforcement began using the location data to build a narcotics trafficking case against a dozen individuals. His ostensible supervisors, NYSDOCCS, took no actions against him despite, presumably, possessing evidence of criminal wrongdoing.

*Lambus I*, 221 F.Supp.3d at 344; *see also id*. at 342 (referring to the so-called "stalking horse" theory (internal quotation marks omitted), which disapproves of a parole officer's acting as a stalking horse for law enforcement officers by searching a parolee not in the performance of the P.O.'s own duties but solely in response to a prior request by, and in concert with, law enforcement officers--a theory adopted in some Circuits but rejected by this Court, *see generally United States v. Reyes*, 283 F.3d 446, 462-65 (2d Cir.) ("*Reyes*"), *cert. denied*, 537 U.S. 822 (2002); *United States v. Newton*, 369 F.3d 659, 666-67 (2d Cir.) ("*Newton*"), *cert. denied*, 543 U.S. 947 (2004)).

41

Notwithstanding its disapproval of the treatment of Lambus, the district court concluded, following the suppression hearings in 2016, that exclusion of GPS data was not warranted.

> "[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful . . . . the deterrence rationale [of the exclusionary rule] loses much of its force." *Davis*, 564 U.S. at 238, 131 S.Ct. 2419 (internal quotation marks and citation omitted). . . . "[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at 232, 131 S.Ct. 2419.

*Lambus I*, 221 F.Supp.3d at 341. The court noted that "[t]wo Second Circuit Court of Appeals opinions"--*Reyes*, 283 F.3d 446, and *Newton*, 369 F.3d 659--"condone the coordination between parole and general law enforcement." *Lambus I*, 221 F.Supp.3d at 342.

Although viewing certain factual circumstances in *Reyes* and *Newton*--the shorter durations of the privacy intrusions and the purposes of the intrusions--as more appropriate than the facts here for application of the good-faith rule, *see id*. at 342-44, the court noted that both *Reyes* and *Newton* had expressly rejected the stalking-horse theory as a basis for suppression, *see id*. at 342. The district court concluded that

42

[t]he unequivocal language in these two decisions--*Reyes* and *Newton*--created a binding appellate precedent that police involvement with a warrantless search of a parolee does not stamp the search as unconstitutional *if it was initiated by a parole officer pursuant to a legitimate supervisory objective.*

In the instant case, the search was initiated by NYSDOCCS to monitor Lambus's adherence to his parole conditions; specifically, his curfew. This is a legitimate supervisory objective. *The decision by NYSDOCCS and the federal agents to coordinate subsequently was reasonable given the Court of Appeals's Reyes and Newton decisions. Neither the NYSDOCCS officers nor the federal law enforcement officers behaved inappropriately.* There would therefore be little deterrent value in excluding the evidence. The court declines to suppress the location data evidence.

*Lambus I*, 221 F.Supp.3d at 342-43 (emphases added); *see id*. at 342 ("Reliance by the parole officers and federal agents on the broad language in these appellate precedents was objectively reasonable.").

3. *The Eventual Suppression of Certain GPS-Generated Data*

Following the district court's 2016 opinion in *Lambus I*, Lambus moved for reconsideration of so much of that decision as denied his motion to suppress GPS-related evidence. He pointed out that the court had not rejected his contention that the GPS monitoring violated his Fourth Amendment rights but had instead found

43

that the violation did not merit a suppression order because the coordination between DOCCS and the federal agencies was conducted in good faith, an issue that had not been briefed by the parties. Following procedural events not material here, the district court granted the motion for reconsideration; and in March and April 2017 it held several days of hearings on the GPS suppression motion. On the first such day, the district court said

> I am prepared to suppress the ankle bracelet, beginning one month after it was imposed, placed on [Lambus]. At which point we know that the Feds knew about it. . . .
>
> . . . .
>
> . . . . I am prepared to tentatively, subject to hearing from everybody and briefing . . . , tentatively decide that it is to be suppressed because the Feds depended on it and they should have gone at that point to a Federal Judge, Magistrate Judge, or District Judge to get an approval. . . .

(Mar. 15, 2017 Tr. 87.)

> *I'm not saying it is illegal*, your putting it on. But only that, *once the Feds effectively in this case*, not as a general rule, but in this specific case, I'm prepared to say, *took control, from that point on, they--and knowing that there was this bracelet[--]they should have gone to a judicial officer*. That is my present analysis.
>
> I understand that it is pushing the envelope fairly far and some might read Second Circuit decisions[] as to suggest that it goes too far. But I am prepared to do it.

44

(*Id*. at 92 (emphases added); *see id*. at 91 ("my tentative view of where the law *should be*" (emphasis added)).)

Thereafter, the court heard additional testimony from Scanlon and testimony from Bureau Chief Parker, S.P.O. Browne, and DEA Special Agent Russell, the essence of which has been described in Parts I.A.1.-I.A.4. above. Following those hearings, the court issued its decision in *Lambus II*, finding that "within one month of placement of the tracking device on defendant's ankle, *the federal authorities*, working closely with state authorities, *directed use of the [GPS] device to provide evidence for the prospective federal criminal case*, and *not for any state parole supervision* or violation charge," 251 F.Supp.3d at 475 (emphases added), and concluding that "[i]nformation obtained as a direct--but not indirect--result of use of the device" should be suppressed, *id*. at 474.

As detailed below, the court found, *inter alia*, that after being contacted by Scanlon, the federal agents immediately took control of the investigation, *see id*. at 478, 483; that from the start of their involvement, the federal agents were aware of the GPS monitoring on Lambus, *see id*. at 477; that the federal agents knew a GPS monitoring device could not lawfully be attached without judicial authorization, *see*

45

*id*. at 488, 501; that no one applied for such authorization, *see id*. at 487-88; that the federal agents prevented Queens II Bureau from removing the GPS tracker until the federal investigation was complete, *see id*. at 486; and that the only purpose of continuing the GPS monitoring of Lambus was to further the federal investigation, *see id*. at 487.

The court found that the initially appropriate curfew-related rationale for placement of Lambus on GPS monitoring soon became an impermissible "pretext" for general law enforcement searches without court approval:

> Absent exigent circumstances, federal investigative or other authorities must obtain a court order before installing or using a location tracking device to monitor the movements of any person or thing. State parole authorities assume they do not need such an order; they placed a device on a state parolee, Kamel Lambus, and kept it on for over two years under the pretext that it was being used to ensure compliance with a curfew.

*Lambus II*, 251 F.Supp.3d at 474; *see also id*. at 496 ("[t]he evidentiary record developed since the court issued its prior opinion confirms that the tracking device was *primarily* used to enable [federal] police to gather evidence for law enforcement purposes" (internal quotation marks omitted) (emphasis ours)); *id*. at 487 (Lambus's GPS tracker was used "*solely*" to further the federal investigation, with the Queens II Bureau supervisory officers "being kept in the dark" as to information gathered as a result of

46

the GPS monitoring, and "the state parole officers responsible for supervising Lambus--Kovics, Browne, and Parker--rarely, if ever, look[ing] at the data being generated by the tracking device." (emphasis added)).  The court found that

> almost from the moment of installation, information from the device was exclusively relied upon by federal authorities working cooperatively with a state official to conduct a complex federal criminal investigation of a major heroin conspiracy that resulted in a federal indictment of defendant.

> Upon recognizing that they were relying on this device to help track a large heroin distribution ring, federal officials should have 1) checked to see if court approval had been given, and, if not, 2) obtained approval from a federal district or magistrate judge.  They did not do so.

*Id*. at 474; *see id*. at 486 ("While the tracking device was not installed on Lambus at the behest of BSS or federal law enforcement, they ensured the device remained on him.").

Reiterating that "[t]he federal authorities were informed about the device nearly 'contemporaneously' with its installation and almost simultaneously the federal HSI became the 'lead agency' investigating the matter," *Lambus II*, 251 F.Supp.3d at 496--*but see id*. at 478 ("[t]hough HSI was designated the 'lead agency,'" "BSS also exerted some control over the investigation"; HSI did "'[n]o[t]'" "'[a]t any point . . . have sole control of the investigation'" (quoting Mar. 17, 2017 Tr. at 143))--

47

the court found that

> [a]t that moment, *Lambus's parole officers ceased being his parole officers for Fourth Amendment purposes and became conduits for the collection of evidence for use by the federal criminal investigating team.* The state *supervisory parole officers*--whose activities generally may fit within the "special needs" warrant exception--*were instructed not to alter his conditions of parole and hardly even glanced at the location data continuously gathered for years at the request of the BSS,*

*Lambus II*, 251 F.Supp.3d at 496 (emphases added); *see generally Newton*, 369 F.3d at 665 ("the operation of a *parole* system," like the "'operation of a probation system[,] . . . presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements,'" if done "pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987) (emphasis in *Newton*))). The district court found the special needs exception inapplicable here, given that "BSS never shared any of the information it compiled with the State supervisory bureau," *Lambus II*, 251 F.Supp.3d at 496, thereby depriving those supervisors both of "full information on the parolee's conduct," needed "to properly supervise a parolee," and of "the autonomy to loosen or tighten the parolee's restrictions as necessary. Lambus's supervising parole officers were deprived of that ability almost as soon as the federal investigation began," *id*. at 485; *see also id*. ("The

48

State's supervisory bureau, its officers, and its objectives were thus rendered a nullity."). The court also noted that despite Lambus's arrest in July 2015 and the "ample evidence of criminal activity," his parole was allowed simply to "lapse[]" a month later, "without any charge of violation of state parole." *Id*. at 496. The court concluded that

> *the true nature of the long-continued search in the instant case . . . was to permit a full scale *federal* criminal investigation and attendant *federal* criminal prosecution that would rely in part on information obtained directly and indirectly from the state installed device.*

> *The search undertaken through use of the ankle bracelet tracking device in the instant case was a search by federal law enforcement officers to "generate evidence for law enforcement purposes*." *Ferguson v. City of Charleston*, 532 U.S. 67, 83, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). Such a search does not fall within the ambit of the "special needs" exception to the warrant requirement. . . .

*Lambus II*, 251 F.Supp.3d at 495 (emphases added).

The court further ruled that despite the State parole authorities' assumption that they did not need court authorization for GPS monitoring of Lambus because he was a parolee,

> [s]earches initiated by state officers are subject to federal rules of criminal procedure when evidence from those searches is to be used in federal court. *United States v. Brown*, 52 F.3d 415, 420 (2d Cir. 1995) ("[F]ederal law is applicable in a federal prosecution even when state police officers were involved."); *see also Preston v.*

49

*United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judge[d] as if the search and seizure had been made by federal officers.").

*Lambus II*, 251 F.Supp.3d at 493. "'[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial.'" *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 223 (1960)). Moreover,

[a] search [by state officers] may be deemed a "federal search" subject to the strictures of [Fed. R. Crim. P.] 41 even where the search is executed by state law enforcement personnel for the purpose of detecting violations of state law if "federal officers '*had a hand in it*.'" [*United States v. ] Turner*, 558 F.2d [46,] 49 [(2d Cir. 1977)] (quoting *Lustig v. United States*, 338 U.S. 74, 78, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949)) (emphasis added) . . . . For a federal agent to have "had a hand" in a search,

> *[i]t is immaterial whether a federal agent originated the idea or joined in it while the search was in progress.* So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.

*Lustig*, 338 U.S. at 79, 69 S.Ct. 1372 (emphasis added).

*Lambus II*, 251 F.Supp.3d at 493. The district court stated that "[t]he *controlling* 'hand'

50

of the federal government in this continuing search of defendant Lambus through a tracking device is unmistakable." *Id*. at 496 (emphasis added).

The court noted that Rule 41(e)(2)(C) of the Federal Rules of Criminal Procedure provides, *inter alia*, that a judicial warrant authorizing a tracking device "must . . . specify a reasonable length of time that the device may be used," and that that "time must not exceed 45 days from the date the warrant was issued," although "[t]he court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each." *Lambus II*, 251 F.Supp.3d at 491 (internal quotation marks omitted). The court stated that the Rule's temporal limitations prevent "open-ended monitoring" such as that imposed on Lambus by NYSDOCCS, *id*. (internal quotation marks omitted), and that a violation of Rule 41

> merits exclusion if "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Burke*, 517 F.2d at 386-87 (Friendly, J.). *Courts may also exclude evidence due to noncompliance with rules when exercising their "supervisory powers over federal law enforcement agencies."* *Rea v. United States*, 350 U.S. 214, 217, 76 S.Ct. 292, 100 L.Ed. 233 (1956),

*Lambus II*, 251 F.Supp.3d at 490 (emphasis added).

51

In the present case, the court found that

> [t]he federal agents disregarded the rules they knew they were bound by when they used the location data generated by the ankle device for years without applying for and obtaining a warrant. This failure to follow Federal Rule of Criminal Procedure 41 "prejudiced" Lambus and warrants exclusion. The tracking device search "would not have been so abrasive if the Rule had been followed;" the search would not have lasted for more than twenty-five months given that the rule only allows for the gathering of location data in 45-day increments. *Burke*, 517 F.2d at 387.

> Alternatively, exclusion is appropriate because the federal authorities used evidence obtained from State authorities for a purpose different than *the State's purported purpose*, without first obtaining a warrant that they otherwise would have needed. *See Birrell*, 470 F.2d at 117.

*Lambus II*, 251 F.Supp.3d at 497 (emphasis added).

The court also ruled that Lambus had not consented to the imposition of GPS monitoring. Despite the fact that in May 2013, "[b]efore the tracking device was installed, Lambus signed a form acknowledging that the 'special condition' of electronic monitoring could last 'until the termination of [his] legal period of supervision,'" *id*. at 476 (quoting Lambus's Special Conditions/GPS Monitoring Form at 1), which was to occur in August 2015, *see Lambus II*, 251 F.Supp.3d at 483, the court found that that did not mean that Lambus had validly consented to such monitoring:

52

The court finds that this extensive consent was not voluntarily given. Lambus signed the acknowledgement form only upon threat of incarceration. Lambus stated that he was []coerced[] into giving his consent because Bureau Chief/Area Supervisor Mark Parker, a supervisor at the DOCCS supervisory bureau responsible for his rehabilitation, told Lambus that "he would violate me and send me back upstate to prison unless I agree to have a GPS ankle bracelet installed on me."

*Id*. at 476 (quoting Lambus Aff. ¶ 14).

Alternatively, the court found that "[t]o the extent that Lambus's consent was voluntary, it was limited in scope to a search lasting only a few months." *Lambus II*, 251 F.Supp.3d at 477. The court found that there was a "verbal understanding between Lambus and his parole officers that the tracking device would only remain on his person for a few months," so inferring: from Lambus's affidavit so claiming; from the court's interpretation of testimony by Parker; from the fact that the GPS monitoring service provider was informed on May 8, 2013, that the scheduled end date was November 8, 2013; and from the DOCCS "Policy and Procedures Manual" on "Electronic Monitoring," which the court read as stating that the duration of monitoring will continue generally from four to six months as a "maximum." *Id*. at 477, 476. Agreeing with concurring opinions in *United States v. Jones*, 565 U.S. 400, 415, 430 (2012), that "[t]he *use* of longer term GPS monitoring in

investigations of most offenses impinges on expectations of privacy," *Lambus II*, 251 F.Supp.3d at 495 (internal quotation marks omitted) (emphasis in *Lambus II*), the district court found that "the long-continued search in the instant case" unreasonably infringed Lambus's expectation of privacy, *id*.

> Because the government has not met its burden of showing that the search of Lambus occasioned by the use of location data by federal agents was reasonable, the search was unconstitutional and violated Lambus's limited Fourth Amendment rights.

*Id*. at 499.

> The court observed in *Lambus II*, as it had in *Lambus I*, *see* 221 F.Supp.3d at 331, that

> [n]ot every unlawful search requires exclusion of its fruits; excluding evidence obtained through a search that violated the Fourth Amendment should only be accomplished if exclusion will "appreciab[ly] deter[]" future violations.

*Lambus II*, 251 F.Supp.3d at 489 (citing *Davis*, 564 U.S. at 237). However, upon reconsideration in *Lambus II*, the court stated that in this case,

> [b]alancing the deterrence value of excluding the location data against the "heavy costs" of ignoring evidence of guilt (*see Davis*, 564 U.S. at 236-37, 131 S.Ct. 2419), the court finds exclusion to be appropriate. Conducting an invasive search for years *for the sole purpose of furthering a general criminal investigation* without any form of judicial approval is a Fourth Amendment violation worth deterring.

54

*Lambus II*, 251 F.Supp.3d at 499 (emphasis added).

Although in *Lambus I* the court had concluded that GPS data should not be suppressed because, given this Court's decisions in *Reyes* and *Newton*, "[n]either the NYSDOCCS officers nor the federal law enforcement officers behaved inappropriately," *Lambus I*, 221 F.Supp.3d at 343, it concluded in *Lambus II* that *Reyes* and *Newton* are applicable only to initial cooperation between state and federal officers and should not be applied to continued cooperative efforts:

> This court extrapolated too far in its previous opinion when it held that . . . the location data evidence should not be suppressed because of good-faith reliance on binding appellate precedent by the federal officers.

> *The hearings conducted [in 2017] . . . to reconsider this court's earlier decision demonstrate that federal investigators knew they should have obtained a warrant. Though there is appellate precedent stating that the "stalking horse" theory is not viable, this conclusion does not mandate that a search, once initiated validly pursuant to the special needs doctrine, is immune from all scrutiny regardless of how it evolves.* Exempting the entire search from the warrant requirement under the special needs exception because it may have initially fallen under that exception, while ignoring clear evidence that the vast bulk of the search had no *special* supervisory objective, would be inappropriate.

*Lambus II*, 251 F.Supp.3d at 500 (emphases added).

55

The court stated that Lambus's motion to suppress the GPS data would be

> granted in part. Information obtained as a direct--but not indirect--result of use of the device is suppressed. Evidence which may indirectly have been obtained from the device, that is to say, evidence that was obtained with the aid of the device that would have been obtained independently by visual surveillance or otherwise, is not *now* suppressed.

*Id*. at 474 (emphasis added). The court predicted that

> [t]he costs of exclusion are unlikely to be particularly heavy. The government has amassed a tremendous amount of evidence against this defendant not *directly* connected to the ankle device. Exclusion of the location data is unlikely to "set the criminal loose in the community without punishment." [*Davis*, 564 U.S.] at 237, 131 S.Ct. 2419.

*Lambus II*, 251 F.Supp.3d at 499 (emphasis added). However, while stating that only "direct[ly] . . . . obtained" "location data generated by the tracking device attached to Lambus's ankle is suppressed," *id*. at 474, 503, the court also said that "[a]ny fruit derived indirectly from this poisonous tree is not suppressed, but the issue may be raised anew with respect to particular items of evidence at the in limine hearing and trial," *id*. at 503.

## II. DISCUSSION

On appeal, the government challenges both of the district court's orders of suppression. Reviewing the court's legal rulings *de novo* and its findings of fact for clear error, *see, e.g.*, *Rajaratnam*, 719 F.3d at 153; *United States v. Barner*, 666 F.3d 79, 82 (2d Cir. 2012), we find merit in the government's challenges.

A. *Suppression of January 9 Authorized Wiretapped Conversations*

The government contends that the district court's order excluding evidence of conversations intercepted pursuant to the January 9, 2015 wiretap authorization should be reversed, arguing that the court committed legal error in failing to apply the standards set by *Franks v. Delaware*, 438 U.S. 154, and clearly erred in finding that the HSI Agent's mistaken representation to the authorizing court was perjurious or intentional. We agree.

1. *Legal Standards Governing Wiretap Suppression*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III"), sets out the minimum requirements for obtaining

57

judicial authorization to intercept wire, oral, or electronic communications. It requires generally that a wiretap applicant, upon oath or affirmation, *see id*. § 2518(1), provide "full and complete statement[s]" both as to probable cause for such interceptions and as to the need to use such methods, *id*. § 2518(1)(b) and (c). In particular, the application must indicate--as relevant here--the facts believed to show probable cause that an individual connected with the requested communication facilities is committing drug trafficking and firearms offenses and probable cause to believe that particular communications concerning those offenses will be obtained through the requested interception, *see id*. § 2518(1)(b); *id*. §§ 2516(1)(e) and (n). As to the necessity for wiretapping, the application must state whether other investigative procedures have been tried and failed, or reasonably appear likely to fail if tried, or appear to be too dangerous. *See id*. § 2518(1)(c). In addition, the application must provide a full statement as to the applicant's knowledge of "all previous applications" for judicial authorization to intercept such communications "involving any of the same persons . . . specified in the application, and the action taken by the judge on each such application." *Id*. § 2518(1)(e).

Title III contains an exclusionary rule, specifying that a defendant may make a motion

to suppress the contents of any [intercepted] wire or oral communication . . . , or evidence derived therefrom, on the grounds that

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). As there is no suggestion in the present case that the January 9 wiretap authorization was insufficient on its face or that the ensuing wiretaps were not made in conformity with that authorization, the only possible basis for suppression under § 2518(10) here would be that the conversations were intercepted "unlawfully," within the meaning of subsection (10)(a)(i). However,

> "*[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'*" [*United States v. Chavez*], 416 U.S.[ 562,] 574-575 . . . [(1974)]. To the contrary, suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States* v. *Giordano*, . . . 416 U.S.[ 505,] 527 [(1974)] . . . .

*United States v. Donovan*, 429 U.S. 413, 433-34 (1977) (emphasis ours). In *Donovan*, the Court dealt with, *inter alia*, a Title III provision requiring the government to include

59

in its wiretap applications "the identity of the person, if known, committing the offense and whose communications are to be intercepted," 18 U.S.C. § 2518(1)(b)(iv). *See Donovan*, 429 U.S. at 416. The Court ruled that that provision was not satisfied by the government's identification of only the proposed interception's "principal" targets, omitting other known targets; rather, the *Donovan* Court concluded that Congress intended that the "wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Id*. at 428. Nonetheless, while stating that that identification provision is "undoubtedly important," *id*. at 434, the Court noted that "nothing in the legislative history suggests that Congress intended this broad identification requirement to play a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance," *id*. at 437 (internal quotation marks omitted). The Court found that the intercept authorization "in all other respects satisfie[d] the statutory requirements," *id*. at 434, and that "[i]n no meaningful sense c[ould] it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept," *id*. at 436. The Court concluded that the "failure to comply fully with" the § 2518(1)(b)(iv)

60

identification requirement did not render the intercepts "unlawful" within the meaning of § 2518(10)(a)(i)). *Donovan*, 429 U.S. at 434.

Although the district court in the present case viewed *Donovan* as holding that suppression pursuant to § 2518(10)(a)(i) could be avoided "only" if the defect in the wiretap application was "inadvertent[]," *Lambus I*, 221 F.Supp.3d at 332, we disagree. In *Donovan*, the government in its relevant wiretap extension application had elected to identify only its original--deemed principal--suspects and had failed to identify as additional suspects respondents Donovan, Robbins, and Buzzacco, whom the government admittedly had heard discussing the targeted illegal activities in the originally authorized wiretap. *See* 429 U.S. at 419-20 & n.5. In challenging the order granting the suppression motion of those three respondents, the government expressly conceded that "Donovan and Robbins were 'known' within the meaning of [§ 2518(1)(b)(iv)] at the time of" its extension application, and it did not challenge the court of appeals' decision that Buzzacco also was known to the government. *Id*. at 419-20 n.5. The Supreme Court ruled that suppression under § 2518(10)(a)(i) was erroneous because the identifications were not central to the determination of probable cause, although it was clear that the government's omission of the names of Donovan, Robbins, and Buzzacco had not been inadvertent.

61

*See id*. at 435-36.  Thus, when the Court noted that there was

> no suggestion in this case that the Government agents knowingly failed to identify respondents Donovan, Robbins, and Buzzacco *for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking*,

*id*. at 436 n.23 (emphasis added), followed by the statement that "[i]f such a showing had been made, we would have a different case," *id*., that observation did not indicate that the omission had been inadvertent or unknowing, but rather simply highlighted the difference between knowledge and purpose.

In the present case, the HSI Agent erroneously stated to the authorizing judge that a check of law enforcement agency databases indicated that there had been no previous wiretap application or authorization for any of the target subjects.  In fact the HSI Agent's ELSUR inquiry had listed only some of the target subjects, and there had in fact been prior wiretap authorizations for some of the persons not listed ("Previous Authorizations").  Thus, although, as discussed in Part II.A.3. below, there was no evidence of any intent to mislead the authorizing judge, the application misrepresented the scope of the database searches, and information as to the Previous Authorizations (unknown to the HSI Agent) was omitted.

However, there is no dispute that the other required contents of the January 9 wiretap application were provided, were accurate, and were (as discussed below) sufficient to establish the requisite probable cause and necessity. And given that the purpose of the prior authorizations requirement seems even less central than the identification requirement at issue in *Donovan*, we cannot conclude that the HSI Agent's error and omission with respect to the Previous Authorizations rendered the January 9 authorized interceptions "unlawful[]" within the meaning of § 2518(10)(a)(i). The *Donovan* Court inferred that Congress may have included the § 2518(1)(b)(iv) identification requirement to "reflect what Congress perceived to be the constitutional command of particularization," *Donovan*, 429 U.S. at 437; *see* S. Rep. No. 90-1097, at 101 (1968) (citing *Berger v. New York*, 388 U.S. 41, 58-60 (1967), and *Katz v. United States*, 389 U.S. 347 (1967)), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2189-90; and that in any event, "Congress required law enforcement authorities to convince a district court that *probable cause* existed to believe that a *specific person* was committing a *specific offense* using a *specific telephone*," *Donovan*, 429 U.S. at 437 n.25 (emphases added). These elements are indeed reflected in Title III's specifications as to what a judge must find in order to find probable cause and necessity for an authorization to intercept: Such authorization is appropriate "if the judge determines on the basis of the facts

63

submitted by the applicant [1] that . . . there is probable cause for belief that an individual is committing, has committed, or is about to commit a [Title III enumerated] offense," [2] that, except in circumstances not at issue here, "there is probable cause for belief that the facilities . . . or place" from which the interception is sought are "leased to, listed in the name of, or commonly used by such person," [3] that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception," and [4] that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. §§ 2518(3)(a), (d), (b), and (c).

In contrast, we have found no legislative history as to Congress's purpose in including the prior authorizations requirement in § 2518(1)(e), and nothing in Title III requires the judge, in order to find probable cause or necessity, to make any findings as to whether there had been interception authorizations for the target subjects in the past.

Given *Donovan*'s ruling that the government's failure to comply with the § 2518(1)(b)(iv) requirement to identify all suspects whose communications were sought to be intercepted did not make the ensuing interceptions "unlawful[]" within the meaning of § 2518(10)(a)(i), we conclude *a fortiori* that the HSI Agent's failure to

provide the less important information that there had been some Previous Authorizations did not make the ensuing interceptions here "unlawful[]." Thus, Title III itself did not authorize suppression of conversations intercepted pursuant to the January 9 authorization.

But the inapplicability of § 2518(10)(a) does not end the suppression inquiry. In addressing a motion to suppress the proceeds of a wiretap on the ground that the application contained misrepresentations or omissions, we, like every other Circuit Court of Appeals, have concluded that the appropriate analytical framework is that set forth in *Franks*, 438 U.S. 154. *See, e.g., Rajaratnam*, 719 F.3d at 143-44, 151-52; *United States v. Miller*, 116 F.3d 641, 664 (2d Cir. 1997), *cert. denied*, 524 U.S. 905 (1998); *United States v. Votrobek*, 847 F.3d 1335, 1342-44 (11th Cir. 2017); *United States v. Stiso*, 708 F. App'x 749, 753-54 (3d Cir. 2017); *United States v. Muldoon*, 931 F.2d 282, 286 (4th Cir. 1991); *Rajaratnam*, 719 F.3d at 152 n.16 (citing cases from the other eight Circuits "rel[ying] on *Franks* to analyze whether alleged misstatements and omissions in Title III wiretap applications warrant suppression").

Under the *Franks* standard, as applied to a challenge to a wiretap authorization's findings of probable cause or necessity,

> "[t]o suppress evidence obtained pursuant to an affidavit
> containing erroneous information, the defendant must show that:

65

*(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding.*" *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (noting that "[i]n order to invoke the *Franks* doctrine, [a defendant] must show that there were *intentional* and *material* misrepresentations or omissions in [the] warrant affidavit." (emphases supplied)).

*Rajaratnam*, 719 F.3d at 146 (last two emphases in *Rajaratnam*; other emphases ours).

In the context of whether an allegedly false statement or omission in a wiretap application was material to the probable cause determinations, materiality is a mixed question of fact and law. *See, e.g., Rajaratnam*, 719 F.3d at 153. Whether the statement was true or false, and whether the affidavit was complete or incomplete, are questions of fact; the issue of whether misrepresentations or omissions were material is a question of law. *See id.*

> To determine whether misstatements are "material," a court must "set[] aside the falsehoods" in the application, *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005), and determine "[w]hether the untainted portions [of the application] suffice to support a probable cause [or necessity] finding," *United States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir. 1995). If the untainted portions of the application are sufficient to support the probable cause or necessity findings, then the misstatements are not "material" and suppression is not required.

66

*Rajaratnam*, 719 F.3d at 146. Where the defect in the affidavit is omissions, the ultimate inquiry under the *Franks* standard

> "is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity]." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted); *see also United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980) ("[W]e [are] required to determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause [or necessity]. . . . If it would not, we would be required to void the warrant and suppress the evidence seized pursuant to it.").

*Rajaratnam*, 719 F.3d at 146.

2. *The Lack of Materiality of The HSI Agent's Misstatement and Omissions*

In the present case, despite noting that this Court had held that the *Franks* analysis should be used in ruling on motions to suppress wiretap evidence based on allegedly defective wiretap applications, *see Lambus I*, 221 F.Supp.3d at 331-32, and despite having accurately described the *Franks* standard as allowing suppression only where the errors were intentional or in reckless disregard for the truth "and" where the falsehoods or omissions were material to the authorizing judge's findings of probable cause or necessity, *id*. at 332 (internal quotation marks omitted), the district

court declined to use that analytical framework, *see id*. at 346. The court made no determination as to materiality; it concluded that "[w]here the government knowingly omits information in violation of Title III's statutory requirements, suppression is appropriate," *id*. at 345. Even if we could uphold the factual findings as to knowledge or intent (*but see* Part II.A.3. below), the court's conclusion was inconsistent with our established legal standard.

There is no dispute as to the fact that the HSI Agent made errors: first in failing to list in the ELSUR request for law enforcement agency database checks the names of all of the persons who would later be listed as wiretap targets in the first authorization application, leading to a failure to discover, and to disclose in the First Wiretap Affidavit (or "Affidavit"), information as to several Previous Authorizations; and second in stating in the Affidavit that a prior check had been made with respect to all of the wiretap targets listed in the Affidavit. Thus, we turn to the legal aspect of the materiality issue, *i.e.*, whether--putting aside the misrepresentation and adding in the omitted information--there remains sufficient independent and lawful information to support the authorizing judge's findings of probable cause and necessity. Addressing that issue of law, we conclude that the HSI Agent's errors were not material.

Disregarding the HSI Agent's misrepresentation that prior checks of the law enforcement databases indicated that there were no Previous Authorizations, the First Wiretap Affidavit amply set forth facts indicating probable cause to believe that the target subjects were engaged in drug trafficking and firearms offenses, that communications concerning those offense would be obtained through a wiretap, and that they used or were associated with the 5283 telephone number as to which interception authorization was requested. As set out in Part I.A.5, above, it described, *inter alia*, an investigation spanning the prior 1½ years, which included consensual telephone conversations on the 5283 telephone and controlled purchases of narcotics by a CI, numerous surveillances by law enforcement agents, identification of drug stash houses frequented by suspected members of the DTO, and a judicially authorized search that led to the seizure of cocaine and drug paraphernalia from premises at which several of the target subjects, including Lambus, were present. It is plain that the untainted portions of the First Wiretap Affidavit were sufficient to establish the requisite probable cause.

Nor can it be concluded that the omission of the fact that there had been Previous Authorizations for some of the target subjects was material to the authorizing judge's assessment of the need for the requested wiretaps. The Affidavit

69

described the several traditional investigative methods that had been tried, including those referred to above in the description of probable cause and others including the use of pole cameras, toll records, pen registers, and subpoenas; but none of the more traditional methods had permitted the agents to identify all of the members of the DTO or identify the organization's drug suppliers. Further, it was deemed unlikely that the CI or undercover officers could safely ferret out such information, given the DTO's compartmentalization and its institutional suspicions of and reluctance to deal with persons other than trusted associates. These facts sufficed to show the need for wiretaps.

If the First Wiretap Affidavit had contained the omitted information that there were some Previous Authorizations (which was included in the second and successive wiretap applications), that information would not have affected the assessment of the need for wiretaps in 2015. As to two target subjects, prior authorizations had been issued in 2004 and 2003, *i.e.*, 11-12 years prior to the application at issue here; and another set of authorizations with respect to Fuller and another target subject had been issued in 2011, some four years before the 2015 application--and a year before Lambus's most recent release from prison. No judge would have concluded that those Previous Authorizations eliminated the need for

wiretaps in the investigation of Lambus that was begun after Lambus's release from prison (and his ensuing Letter) in 2012 and joined by the federal agencies in 2013. Further, given the nature of narcotics conspiracies as continuing enterprises, the fact that Previous Authorizations had been issued for some of the January 2015 target subjects--presumably upon showings including probable cause--would likely have strengthened the January 2015 application's showing of probable cause.

In sum, the untainted portions of the First Wiretap Affidavit made ample showings to support the authorizing judge's determinations of both probable cause and necessity, and the inclusion of the omitted information as to Previous Authorizations would not have diminished those showings. The HSI Agent's misstatement and omissions were thus not material, and under that branch of the *Franks* standard, suppression was error.

3. *The Record as to the Nature of the HSI Agent's Errors*

Under the other branch of the *Franks* standard, even if the misrepresented or omitted information was material, a motion to suppress is to be denied unless the misrepresentations or omissions were intentional or deliberate, or

71

were made in reckless disregard for the truth. *See, e.g., Franks*, 438 U.S. at 155-56. Thus, "misstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression." *Rajaratnam*, 719 F.3d at 153 (quoting *Franks*, 438 U.S. at 171).

Whether the affiant had an intent to deceive is a question of fact. *See, e.g., Rajaratnam*, 719 F.3d at 153 ("[w]hether an individual had a particular mental state 'is a question of fact'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))). Likewise, "whether a person acted with 'reckless disregard for the truth' is 'a factual question of intent.'" *Rajaratnam*, 719 F.3d at 153 (quoting *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir. 1997)). Thus, findings as to whether the affiant had such intention or reckless disregard are reviewed for clear error. *See, e.g., Rajaratnam*, 719 F.3d at 153; *United States v. Trzaska*, 111 F.3d at 1028.

However, "a district court's understanding of the 'reckless disregard' *standard* is reviewed *de novo*." *Rajaratnam*, 719 F.3d at 153 (emphasis added).

A wiretap applicant does not *necessarily* act with "reckless disregard for the truth" simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be "clearly critical." Rather, the reviewing court must be presented with credible and probative *evidence* that the omission of information in a wiretap application was "*designed* to mislead" or

72

was "*made in reckless disregard of whether [it] would mislead.*" *Awadallah*, 349 F.3d at 68 . . . .

*Rajaratnam*, 719 F.3d at 154 (first emphasis in *Rajaratnam*; other emphases ours).

While "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly," the court must bear in mind that "*Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the [authorizing judge]." *Id*. (other internal quotation marks omitted) (emphases in *Rajaratnam*).

Of course, the "reckless disregard" aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information in a wiretap application. . . . Recklessness *may* be inferred where the omitted information was clearly critical to the probable cause determination. . . . Subjective intent, after all, is often demonstrated with objective evidence.

*Id*. (other internal quotation marks omitted) (emphases in *Rajaratnam*).

"But such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information," *id*.; and indeed, where the omitted facts would have provided an additional or stronger reason for the judge or magistrate to authorize the requested warrant, a finding that those facts were omitted with "reckless disregard for the truth" is counterintuitive, *see id*. at 155 ("we

73

cannot conclude that the government['s] omi[ssion of] certain information" was done "with 'reckless disregard for the truth' when it is clear that fully disclosing the details of that investigation would only have *strengthened* the wiretap application's 'necessity' showing" (emphasis in *Rajaratnam*)); *see also id*. at 155 n.18 ("it is difficult to imagine a situation where the government would intentionally or 'with reckless disregard' omit information that would *strengthen* its 'probable cause' or 'necessity' showing" (emphasis in *Rajaratnam*)).

In the present case, the HSI Agent, testifying at the 2016 hearing, stated that the errors had not been made with any intent to mislead the authorizing judge; the database check request itself was flawed because not all of the target subjects had been listed in the request form; and in drafting the Affidavit's statement as to prior authorizations, the HSI Agent testified, "I misunderstood what I was saying" (2016 Tr. 157).

In *Lambus I*, the district court found that the HSI Agent's misstatement "was not a misunderstanding," that "he knew it was false," and that "[i]t was perjury." 221 F.Supp.3d at 346 (internal quotation marks omitted). However, the district court did not point to any evidence to support the proposition that the HSI Agent's

74

misstatement to the authorizing judge as to previous wiretap applications was intentional, or in reckless disregard of the truth, nor any analysis that could support a finding of perjury.

Perjury is generally defined under federal law as a declarant's "willfully . . . stat[ing] or subcrib[ing]" under oath "any material matter which he does not believe to be true," 18 U.S.C. § 1621(1); *see also id*. § 1623(a) (forbidding "knowingly" making to a court "any false material declaration . . . knowing the same to . . . [be] false"). "The statutory text expressly requires that the false declaration be 'material.'" *Johnson v. United States*, 520 U.S. 461, 465 (1997) (discussing § 1623). As discussed in Part II.A.2. above, the district court made no findings as to the materiality of the HSI Agent's mistakes, and we have concluded they were not material.

In addition, the court cited no evidence to show that the HSI Agent's errors were intentional, much less that they were made "willfully," a word that implies both a "knowledge and a purpose to do wrong," *Spurr v. United States*, 174 U.S. 728, 734 (1899) (internal quotation marks omitted). There was no suggestion as to any possible motive for the HSI Agent to commit the errors, nor any evidence that the errors were designed to mislead the authorizing judge. Indeed, as mentioned in

the previous section, the inclusion of information as to the Previous Authorizations would only have strengthened, not weakened, the application's proffer as to probable cause. The district court's sole evidentiary findings in this regard were its observations that the HSI Agent was "experienced" (2016 Tr. 166) and had "been an affiant in previous wiretap applications," *Lambus I*, 221 F.Supp.3d at 346 (citing 2016 Tr. 159). But on this record, lacking any hint of a motive to conceal the Previous Authorizations, these observations are more consistent with carelessness and negligence than with knowing or deliberate falsehoods, reckless disregard, or perjury.

Finally, we note that in fact, in hearings both before and after *Lambus I*'s language accusing the HSI Agent of knowing falsehood and perjury, the court's statements clearly suggested that the errors had been merely careless rather than intentional falsehoods. Thus, at the pre-*Lambus I* 2016 hearing in which the HSI Agent stated that the errors had not been deliberate and, when the AUSA pointed them out, had been corrected for the second and successive wiretap applications (*see* 2016 Tr. 160, 164), the court promptly ended the hearing, stating that it "[wa]s *obviously an error*" on the HSI Agent's part (*id*. at 164-65 (emphasis added)), and that the First Wiretap Affidavit had been "done *carelessly*" (*id*. at 166 (emphasis added)). And even

76

having made a perjury finding in *Lambus I*, when there was discussion at a subsequent hearing as to what witnesses would testify the court referred to the HSI Agent as "a witness [who] *made a mistake* or lied on one occasion," and "*I have not said he lied*."  (Apr. 10, 2017 Tr. 5 (emphases added).)

We conclude that the district court neither conducted the necessary legal analysis nor cited sufficient evidence to support the *Lambus I* findings that the HSI Agent had engaged in knowingly false statements, reckless disregard of the truth, and perjury.

We can appreciate the district court's frustration at careless government representations that may impact the integrity of judicial decisions, especially proffers in support of *ex parte* applications that an adversary has no opportunity to dispute. However, while there are times when a district court may properly find it "absolutely necessary[, in order] to preserve the integrity of the criminal justice system," to suppress evidence under its inherent or supervisory authority, *United States v. Getto*, 729 F.3d 221, 229 (2d Cir. 2013), "the Supreme Court has explained that a 'court's inherent power to refuse to receive material evidence is a power that must be *sparingly exercised* [only in cases of] *manifestly improper conduct* by federal officials,'"

77

*id*. at 230 (quoting *Lopez v. United States*, 373 U.S. 427, 440 (1963) (emphases ours)). "We too have recognized that courts cannot fashion their own sub-constitutional limitations on the conduct of law enforcement agents." *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996) (internal quotation marks omitted). Accordingly, the court should not exercise its inherent or supervisory power "as a substitute for Fourth Amendment jurisprudence, which adequately safeguards against unlawful searches and seizures." *Id.*; *cf. United States v. Payner*, 447 U.S. 727, 737 (1980) ("the supervisory power does not extend so far" as to "confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing").

*Franks* and our precedents detail the framework governing motions for the suppression of evidence obtained pursuant to an allegedly defective Title III wiretap affidavit. We conclude that the court in this case erred in disregarding these standards, under which suppression was not merited, and suppressing such evidence by invoking its inherent authority.

B. *The Suppression of Direct GPS Data*

The government contends that the district court's order excluding location data generated by the GPS tracker attached to Lambus's ankle was erroneous,

arguing (1) that GPS monitoring of Lambus without judicial authorization was not unreasonable under the Fourth Amendment in light of Lambus's status as a parolee, his acknowledgements of parole officers' authority to search his person and to attach a GPS tracker, and the monitoring's relationship to the parole officials' duties; and (2) that, in any event, suppression should have been denied under the good-faith doctrine of *Davis*, 564 U.S. 229. We find merit in these contentions.

1. *Parolees, Privacy Rights, and Reasonable Searches*

The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. The government does not contest Lambus's contention that the attachment of a GPS tracking device to his ankle constituted a search, *see generally Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015); *cf. Jones*, 565 U.S. at 404 (installation of GPS on vehicle and subsequent use of that device to monitor movements is a search); *Carpenter v. United States*, 138 S. Ct. 2206 (2018) (accessing historical cell phone records is a search), and we will assume this point *arguendo*. We note, however, that those cases concerned the installation or use of tracking devices without the monitored individual's consent. *See, e.g., Grady*, 135 S. Ct. at 1370; *Jones*, 565 U.S. at 416 (Sotomayor, *J.*, concurring); *id*. at 420 (Alito, *J.*,

79

concurring in the judgment). We need not opine whether an individual has been "searched" for Fourth Amendment purposes where he is fully aware of a GPS monitor and voluntarily consents to its placement on his person or property.

As indicated by its text, the Fourth Amendment's touchstone is reasonableness. As a general matter, "[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*, 135 S. Ct. at 1371; *see, e.g.*, *Samson v. California*, 547 U.S. 843, 848 (2006); *United States v. Knights*, 534 U.S. 112, 118 (2001).

Reasonableness in the totality of the circumstances "'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate government interests.'" *Samson*, 547 U.S. at 848 (quoting *Knights*, 534 U.S. at 118-19). The Fourth Amendment "protects the right[s] of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *Newton*, 369 F.3d at 664. But for the expectation of privacy to be "legitimate," and therefore protected by the Fourth Amendment from "unreasonable government intrusions," a parolee "must have exhibited an actual

80

(subjective) expectation of privacy *and the expectation must be one that society is prepared to recognize as 'reasonable.'"* *Reyes*, 283 F.3d at 457 (internal quotation marks omitted) (emphasis ours).

Probationers, parolees, and persons subject to supervised release have "significantly diminished" expectations of privacy. *See Samson*, 547 U.S. at 848-50; *Reyes*, 283 F.3d at 457-58. In *Knights*, the Supreme Court concluded that

> the probation search condition of the defendant's state probation-- requiring him to submit to a search of his person, property, residence, vehicle, or personal effects "at any time," with or without a warrant or reasonable cause, "by any probation officer or law enforcement officer"--was a "salient circumstance" in the Fourth Amendment analysis of the search conducted in the defendant's apartment.

*Reyes*, 283 F.3d at 461 (quoting *Knights*, 534 U.S. at 114, 118 (*Reyes*'s emphasis omitted)). We also observed in *Reyes* that "[t]he [*Knights*] Court noted, in particular, that the defendant had signed the probation order, which stated his awareness of the terms and conditions of his probation and his agreement to those terms." *Reyes*, 283 F.3d at 461; *see Knights*, 534 U.S. at 114; *see also United States v. Thomas*, 729 F.2d 120, 123 (2d Cir. 1984) (a parolee who has "been alerted to the conditions of parole, . . . would not have the expectation of privacy enjoyed by ordinary citizens").

New York law authorizes a parole officer to search a parolee's home or person, without a search warrant, if the search is "rationally and reasonably related to the performance of his duty as a parole officer." *People v. Huntley*, 43 N.Y.2d 175, 179, 401 N.Y.S.2d 31, 33 (1977) ("*Huntley*"). Noting that the Fourth Amendment prohibits only searches and seizures that are "unreasonable," *id*. at 180, 401 N.Y.S.2d at 34, the *Huntley* Court

> observe[d] that *in any evaluation of the reasonableness* of a particular search or seizure *the fact of defendant's status as a parolee is always relevant and may be critical*; what may be unreasonable with respect to an individual who is not on parole may be reasonable with respect to one who is (*United States ex rel. Santos v New York State Bd. of Parole*, . . . 441 F2d 1216, 1218 [2d Cir. 1971)]). . . .

> Where . . . the search and seizure is undertaken by the parolee's own parole officer, in our view *whether the action was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty*. It would not be enough *necessarily* that there was some rational connection; *the particular conduct must also have been substantially related to the performance of duty in the particular circumstances*.

*Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34 (emphases added).

New York State has adopted standard conditions governing persons who have been convicted of a crime and have been released from prison. Its regulations require that "[a] copy of the conditions of release, with the addition of any special

82

conditions, . . . be given to each inmate upon his release to supervision." 9 NYCRR 8003.2. One standard condition is that

> [a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property.

9 NYCRR 8003.2(d); *see, e.g., Newton*, 369 F.3d at 663.

A New York State parolee, by signing the "standard authorization . . . for searches of his person, residence or property," does not give "an unrestricted consent to any and all searches whatsoever or . . . a blanket waiver of all constitutional rights to be secure from *unreasonable* searches and seizures." *Huntley*, 43 N.Y.2d at 182, 401 N.Y.S.2d at 35 (emphasis added). Nonetheless, "persons on supervised release who sign such documents manifest an awareness that supervision can include intrusions into their residence [or property or person] and, thus, have 'a severely diminished expectation of privacy.'" *Newton*, 369 F.3d at 665 (quoting *Reyes*, 283 F.3d at 461). As interpreted by the *Huntley* Court, such a signed authorization "merely parallels, by way of confirmation, the right of the parole officer which [that Court] uph[e]ld-- namely, the right to conduct searches rationally and substantially related to the performance of his duty." 43 N.Y.2d at 182-83, 401 N.Y.S.2d at 35.

83

An additional standard condition of release under New York law is that

> [a] releasee will not behave in such manner as to violate the provisions of any law to which he is subject which provides for penalty of imprisonment, nor will his behavior threaten the safety or well-being of himself or others.

9 NYCRR 8003.2(h). One aspect of "the parole officer's duty" thus includes "an obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes." *Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34; *see, e.g.*, *United States v. Barner*, 666 F.3d at 85; *Newton*, 369 F.3d at 666 (parole officer has a duty "'to investigate whether a parolee is violating the conditions of his parole'" by "'commit[ting] . . . further crimes'" (quoting *Reyes*, 283 F.3d at 459)); *see also Griffin*, 483 U.S. at 875 ("the restrictions" associated with probation are "meant to assure" not only "that the probation serves as a period of genuine rehabilitation," but also "that the community is not harmed by the probationer's being at large").

This Court also observed in *Reyes* and *Newton* that, given the parole officer's duty to verify whether the supervisee is committing other crimes, some coordination between parole officers and law enforcement officers is often necessary, and the fact that a new prosecution may ensue is not a sign that the parole officer was not pursuing his normal duties.

84

Law enforcement officers are yoked with similar responsibilities to root out crime in the public at large. Accordingly, the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined. Indeed, it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities, would not be pursuing legitimate supervised release objectives. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) ("[P]olice officers and probation officers can work together and share information to achieve their objectives."); [*United States v. ]McFarland*, 116 F.3d [316,] 318 [(8th Cir. 1997)] (stating that "[p]arole and police officers may work together . . . provided the parole officer is pursuing parole-related objectives"); [*United States v. ]Watts*, 67 F.3d [790,] 794 [(9th Cir.1995)] (approving of probation officer's enlistment of police officers to assist his own legitimate objectives).

*Reyes*, 283 F.3d at 463-64 (footnote omitted); *see also Newton*, 369 F.3d at 667, 666 (when parole officers have received "information suggest[ing] criminal conduct in addition to that for which [a parolee] ha[s] already been convicted," it is "a reasonable exercise of their parole dut[ies]" to investigate further, and, as may reasonably be thought necessary to carry out those duties, to seek assistance from law enforcement officers).

As noted in the district court's opinion in *Lambus I*, 221 F.Supp.3d at 342, *Reyes* and *Newton* rejected the stalking-horse theory that such cooperation between parole officers and law enforcement officers is impermissible in the absence of court-

85

ordered warrants. As stated in *Reyes*,

> collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives.

*Reyes*, 283 F.3d at 463 (internal quotation marks omitted).

> *Reyes*'s rejection of challenges to coordinated efforts between probation/parole officers and other law enforcement officials turned not on the particular level of intrusion in that case, but on the legitimacy of the supervision objectives being pursued by the probation officers.

*Newton*, 369 F.3d at 667.

### 2. *The Evidence With Regard to the Monitoring of Lambus*

Given the above framework, we have several difficulties with the district court's decision in *Lambus II*. Principally, the court found that the continuation of GPS monitoring of Lambus was impermissible without judicial authorization, based on its view that that continuation was directed by federal officials, a view not supported by the evidence presented at the hearings. Further, in urging renewed or reconfigured acceptance of the stalking-horse concept, the court overemphasized the State's interest

86

in enforcing curfews, giving little or no deference to its interest in protecting the public from further criminal activity by parolees--an interest recognized generally, as discussed in Part II.B.1. above, and detailed by Scanlon, whose testimony the court found "credible," *Lambus I*, 221 F.Supp.3d at 337 (*see also* Mar. 15, 2017 Tr. at 88 ("very credible"); *id*. at 16 ("highly credible")).  In addition, the court accorded to Lambus a privacy expectation that was not reasonable or legitimate in light of the legal conditions of supervision to which he was subject or the documents he signed acknowledging those conditions; and it imposed a temporal limitation on the continuation of GPS monitoring that was not warranted by DOCCS regulations and was contradicted by the testimony of the DOCCS witnesses and by Lambus's signed Special Conditions/GPS Monitoring Form.

a. *The Finding of Federal Control of GPS Monitoring*

The district court found that "[a]t th[e] moment" the federal agents were informed of Lambus's GPS tracker, they took control of the investigation, and "Lambus's parole officers ceased being his parole officers for Fourth Amendment purposes and became conduits for the collection of evidence for use by the federal criminal investigating team."  *Lambus II*, 251 F.Supp.3d at 496; *see id*. (referring to

"[t]he controlling 'hand' of the federal government in this continuing search of defendant Lambus through a tracking device"); (*see also* Mar. 15, 2017 Tr. 92 ("the Feds effectively in this case . . . took control")). The court found that "the federal authorities, working closely with state authorities, directed use of the [GPS] device to provide evidence for the prospective federal criminal case, and not for any state parole supervision or violation charge," *Lambus II*, 251 F.Supp.3d at 475, and that "[w]hile the tracking device was not installed on Lambus at the behest of BSS or federal law enforcement, *they* ensured the device remained on him," *id*. at 486 (emphasis added). We do not see that the record supports the finding that the State parole officials became mere conduits for federal law enforcement or that the GPS monitoring of Lambus was continued at the behest of the federal agents.

As a general matter, the record showed that the investigation of Lambus was a joint State and federal operation, instigated by the State. The investigation of Lambus for possible new criminal activity after his release from prison in 2012 had been initiated by NYSDOCCS following its interception of the June 2012 Lambus Letter, which raised suspicions that Lambus, barely three months after his release from prison, and with more than three years left to serve on supervised release, was again engaging in drug-related activities. It was BSS's Scanlon, assigned to

88

investigate as a result of the Lambus Letter, who requested assistance from federal authorities. Scanlon contacted ICE in June 2013, and the investigation was joined by ICE's branch HSI; BSS and ICE were joined by the DEA in August of 2014. Both Scanlon and DEA Special Agent Russell testified that the investigation was conducted jointly. As described in greater detail in Part I.A.3. above, while Scanlon testified that HSI was designated the lead agency because it was supplying manpower and money, he testified that BSS shared control of the investigation. Both Scanlon and Russell described Scanlon as one of the "lead[ers]," who not only relayed the GPS data to the federal agents but also, *inter alia*, monitored wiretapped conversations, planned strategy, and helped to "draw[] up the [operational] plan." (*E.g.*, Mar. 17, 2017 Tr. 142, 165, 170; Apr. 11, 2017 Tr. 225, 198.)

There was no evidence that any federal agent had a role in the decision to extend Lambus's GPS monitoring. Russell was a latecomer to the joint investigation, not arriving until several months after NYSDOCCS Bureau Chief Parker had decided to continue the monitoring; and Russell was under the mistaken impression that the monitoring of Lambus had been court-ordered. HSI's Popolow, who had joined BSS's investigation a month after Lambus was placed on GPS monitoring, was fully aware that the tracker had been put on by DOCCS pursuant to

89

its parole supervision authority. But there is no evidence that he urged its continuation.

Parker had the authority to end or continue Lambus's GPS monitoring. He was asked whom he consulted before making his decision in the spring of 2014 to continue it, and he testified that he consulted and received recommendations from BSS, DOCCS's regional director, and DOCCS's deputy director. There is no evidence that Parker had any contact with the federal agents.

Scanlon, who was working with the federal agents on the investigation, testified that they "[n]ever"--"[n]ot once"--asked him "not to violate" Lambus (2016 Tr. 120); and that there was "[n]ever any recommendation by federal law enforcement agents to keep Mr. Lambus on GPS monitoring" (Mar. 15, 2017 Tr. 22). No contrary evidence has been called to our attention; and our own review of the record before us has turned up no such evidence.

b. *Conditions of Parole and Parole Officers' Duties*

The district court also found that "[i]n the instant case, the search was initiated by NYSDOCCS *to monitor Lambus's adherence to his parole conditions; specifically, his curfew*," *Lambus I*, 221 F.Supp.3d at 343 (emphasis added)--that the

90

initial purpose of the GPS tracker was "to monitor whether [Lambus] was abiding by the curfew condition of his parole," *id*. at 344 (citing 2016 Tr. 98), and "*not* because he was [sus]pected of any criminal wrongdoing," *Lambus I*, 221 F.Supp.3d at 344 (emphasis added). The court stated that "[t]his purpose shifted as federal law enforcement began using the location data to build a narcotics trafficking case against a dozen individuals," *id.*, and that "State parole authorities . . . kept [the GPS tracker] on for over two years under the pretext that it was being used to ensure compliance with a curfew," *Lambus II*, 251 F.Supp.3d at 474; *see also Lambus I*, 221 F.Supp.3d at 344 ("The shifting purpose of the search--from monitoring whether a parolee was violating the conditions of his parole, to gathering evidence about a narcotics trafficking ring--lessens the legitimacy of the government's interest in the particular braceleting."). We have three main difficulties with these findings.

First, the record indicates that one of the reasons for subjecting Lambus to GPS monitoring initially was indeed his suspected drug dealing. The portion of the 2016 transcript cited by the district court for the proposition that Lambus's placement on GPS monitoring was solely curfew-related was testimony of Scanlon. And despite the district court's statement that Scanlon "swore that . . . Lambus's violations of his curfew" were "what motivated the supervisory bureau to impose the

91

GPS monitoring," *id*. at 337, the transcript reveals that Scanlon--who had not known of the decision to impose GPS monitoring on Lambus until after it was imposed--was responding to a question about the monitoring explanation that he had received from P.O. Kovics; and Kovics mentioned only the problem with curfew (*see* 2016 Tr. 98). As testified to by S.P.O. Browne and Bureau Chief Parker, however, the monitoring decision had been made by Parker after conferring with Browne (*see* Apr. 11, 2017 Tr. 139; Apr. 10, 2017 Tr. 89); and Browne testified that while the immediate impetus for placing Lambus on GPS monitoring on May 8, 2013 was "primar[il]y" his noncompliance with curfew on May 5 (Apr. 11, 2017 Tr. 133), there were at least three reasons for the monitoring: "a curfew violation *and* a report of illegal activities in [Lambus's] residence" (*id*. at 113 (emphasis added)), and "[i]n addition," "allegations of drug dealings" (*id*. at 135). "All of those factors played into placing him on electronic monitoring." (*Id*.)

Second, the court's view that the continuation of GPS monitoring on Lambus constituted a "purpose shift[]" away from "monitor[ing] Lambus's adherence to his parole conditions," *Lambus I*, 221 F.Supp.3d at 344, 343, disregarded the scope of both Lambus's parole conditions and the parole officers' obligations to investigate his compliance. As discussed above, a parolee's release conditions forbid him to

92

commit further crimes, and one of a parole officer's responsibilities is to detect whether the parolee is violating that condition. Indeed, as Scanlon testified, BSS's primary function in NYSDOCCS is investigating criminal activity that had a nexus to a particular parolee. Throughout the period of Lambus's release in 2012-2015, Scanlon's principal focus was on determining the extent of Lambus's criminal activity. Thus, the shift in the GPS monitoring's purpose was a change in emphasis from one aspect of Lambus's parole to another, not a shift away from concerns regarding his parole.

Third, although the federal agents were interested in rounding up the entire membership of the DTO, the record indicates that Scanlon's own interest in any persons other than New York State parolees was purely peripheral. Scanlon testified that the identification of members of the DTO other than Lambus was relevant to him because if any of those members were State parolees, stopping them from engaging in new criminal activity was part of his job. And plainly, Scanlon sought prosecution of Lambus as part of his obligation to see that the public was safe from new crimes by parolees; he stated that he viewed federal prosecution as the best vehicle to accomplish that goal, given that the several prior State prosecutions and incarcerations of Lambus plainly had not provided sufficient deterrence. Thus, when

93

Parker was considering ending Lambus's GPS monitoring, Scanlon recommended its continuation in order to assist his Lambus-focused investigation, for which he had enlisted federal assistance. And Parker received the same recommendation from his regional director and the DOCCS deputy director.

The district court viewed the parole officials as merely acting as conduits for the accomplishment of federal objectives rather than pursuing State parole supervision goals principally because Lambus could have been, but was not, charged with parole violations earlier (or when he was eventually arrested on federal charges), *see, e.g., Lambus I*, 221 F.Supp.3d at 344 ("[h]is ostensible supervisors, NYSDOCCS, took no actions against him despite, presumably, possessing evidence of criminal wrongdoing"); *Lambus II*, 251 F.Supp.3d at 485 (his "supervising parole officers were deprived of" the necessary "autonomy" to loosen or tighten the parolee's restrictions as they saw fit). We do not see that this rationale finds support either in principle or in the record. Law enforcement investigators, for example, are "under no constitutional duty to . . . arrest [a defendant] the moment they receive[] confirmation" of his criminal wrongdoing. *United States v. De Biasi*, 712 F.2d 785, 795 (2d Cir.), *cert. denied*, 464 U.S. 962 (1983); *see, e.g., Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("[t]here is no constitutional right to be arrested," and "[l]aw enforcement

94

officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause"). Surely there is an even lesser requirement that parole officers seek to return a parolee to prison as soon as he violates a condition of his release; part of their duty, after all, is to try to help the parolee readjust to public life and avoid reincarceration. And indeed, DOCCS has devised graduated sanctions in part to avoid, where appropriate, that harshest penalty.

In addition, Scanlon testified that many of Lambus's observable early miscues were minor, that charging him with them would not have gotten him reincarcerated, and that leaving him at large would likely not result in the cessation of the drug trafficking activity of which he was suspected--although it would likely cause him to become more circumspect, making it more difficult to prove his criminal activity. The decisions not to violate Lambus for minor infractions, not to alert him to BSS's investigation, and not to remove his GPS tracker, which was providing valuable information for the investigation of his drug-trafficking parole violation, were made solely by NYSDOCCS (*see*, *e.g.*, 2016 Tr. 120 and Mar. 15, 2017 Tr. 22 (federal agents "[n]ever" asked that Lambus not be violated or not be removed from GPS monitoring)). Those DOCCS decisions--and whether its supervisory bureaus

95

should have "autonomy" to make decisions overriding the views of BSS and the DOCCS deputy director--were surely matters for the State parole officials' exercise of their discretion rather than for second-guessing by the court.

Given all the circumstances, we cannot endorse the district court's view that the continuation of the GPS monitoring on Lambus was not rationally and reasonably related to, and instead marked a shift away from, parole officers' duties.

As this Court recognized in *Reyes* and *Newton*--*see* Part II.B.1. above--"the duties and objectives of probation/parole officers and other law enforcement officials, although distinct, may frequently be 'intertwined' and responsibly require coordinated efforts." *Newton*, 369 F.3d at 667 (quoting *Reyes*, 283 F.3d at 463-64). "Accordingly, the law permits cooperation between probation officers and other law enforcement officials so that they may work together and share information to achieve their objectives," *Reyes*, 283 F.3d at 471, and we have squarely rejected the "argument that police assistance during an otherwise reasonable warrantless search by parole officers thereby invalidates the search," *Newton*, 369 F.3d at 662. We adhere to this view with regard to BSS's collaboration with federal law enforcement authorities in this case.

The above conclusions, that subjecting Lambus to GPS monitoring for the entire course of Scanlon's investigation to determine whether he was violating his release conditions by engaging in drug trafficking activity did not violate Lambus's rights under the Fourth Amendment, means that it is unnecessary to reach the question of whether suppression should have been denied under the good faith doctrine, *see Davis*, 564 U.S. at 232 ("searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"). However, we are constrained to note that were we to conclude that the coordination between parole officers and law enforcement officers in this case was impermissible-- adopting the view of the law as the district court stated it "should be" (Mar. 15, 2017 Tr. 91)--*Davis* would surely be applicable, and reversal of the district court's order excluding GPS data would clearly be required.

c. *The Findings as to Lambus's Expectation of Privacy*

The district court observed in *Lambus I* that Lambus, in anticipation of his release from prison in 2012, had signed a PRS Certificate (or "Certificate") in which he acknowledged conditions of his release and, as set out in Part I.A.1. above, agreed, *inter alia*, "I will permit . . . the search and inspection of my person" (PRS Certificate

97

¶ 4). *See Lambus I*, 221 F.Supp.3d at 325, 339. The court found, however, that the subjection of Lambus to GPS monitoring "for over two years . . . was not specifically covered by Lambus's Certificate." *Id*. at 343. While the court found in *Lambus II* that in May 2013 Lambus had signed the Special Conditions/GPS Monitoring Form, it found that that form did not constitute consent to GPS monitoring on the ground that it was coerced. *Lambus II*, 251 F.Supp.3d at 498. The court credited Lambus's assertion that he had been "coerced into giving his consent because Bureau Chief . . . Parker . . . told Lambus that 'he would violate [Lambus] and send [him] back upstate to prison unless'" Lambus agreed to GPS monitoring. *Lambus II*, 251 F.Supp.3d at 476 (quoting Lambus Aff. ¶ 14 (other internal quotation marks omitted)).

We have little doubt that Parker told Lambus "in sum and substance" that if he did not agree to wear the GPS tracker he would be charged with parole violations that could lead to his reimprisonment (Lambus Aff. ¶ 14), and that Lambus "only signed the consent form to put the GPS ankle monitor on [him] because [he] feared being sent back to prison" (*id*. ¶ 25). Parker testified that he did not recall saying "specifically" that he would "ship [Lambus] Upstate," but he testified,

> I am sure I discussed with him the expectations of getting the
> electronic monitor placed on him and going over with him the
> consequences of not adhering to any special conditions

98

subsequent to that and the consequences could lead to a violation and his incarceration. I'm sure that was discussed with him.

(Apr. 10, 2017 Tr. 94.) But the parole officers had sufficient grounds to charge Lambus with parole violations; he had, *inter alia*, failed to comply with curfews and had been seen in the company of known felons. And the district court itself opined that "NYSDOCCS . . . presumably[] possess[ed] evidence of [Lambus's] criminal wrongdoing." *Lambus I*, 221 F.Supp.3d at 344. Thus, the parole officers had multiple justifiable options, including charging Lambus with parole violation in order to seek his return to prison or using the less severe sanction of GPS monitoring. They offered Lambus the choice between those two. The "fact that a [parolee] has to choose between two lawful, albeit distasteful, options does not render that choice coerced." *United States v. Polly*, 630 F.3d 991, 999 (10th Cir. 2011).

The issue here, however, is not so much whether Lambus gave consent as it is whether he had a reasonable and legitimate expectation of privacy. Given a parolee's diminished expectation of privacy, *Huntley* noted that where his parole officer's search is rationally and reasonably related to the performance of his duty as a parole officer, the parolee's consent is not necessary; it is concomitant with the officer's performance of his duty. *See* 43 N.Y.2d at 182-83, 401 N.Y.S.2d at 35; *Newton*,

99

369 F.3d at 666 ("neither *Huntley* nor [Second Circuit law] holds that consent, whether obtained pursuant to parole regulation § 8003.2 or otherwise, is required in addition to a reasonable relationship to the parole officer's duty to justify a warrantless parole search"). Lambus's signing of the PRS Certificate, acknowledging that parole officers had the right (unless unreasonable, *see id*. at 181, 401 N.Y.S.2d at 34) to "search" his "person," and his signing of the Special Conditions/GPS Monitoring Form in which he "agree[d] to wear the transmitter on my person and to keep the monitor plugged into and attached to my telephone, and to do both for twenty-four hours a day, seven days a week, during the period of my participation in the program" is inconsistent with either a legitimate or a reasonable expectation of privacy protecting him from constant search via GPS. (*See* PRS Certificate ¶ 4; GPS/Electronic Monitoring Form at 4, ¶ 3.) "[P]ersons on supervised release who sign such documents manifest an awareness that supervision can include intrusions into their [persons] and, thus, have 'a severely diminished expectation of privacy.'" *Newton*, 369 F.3d at 665 (quoting *Reyes*, 283 F.3d at 461).

Nor can we uphold the district court's finding that "[t]o the extent that Lambus's consent [to GPS monitoring] was voluntary, it was limited in scope to a search lasting only a few months," *Lambus II*, 251 F.Supp.3d at 477, which was based

100

principally on the court's finding that there was a "verbal understanding between Lambus and his parole officers that the tracking device would only remain on his person for a few months," *id*. Other than an assertion in Lambus's affidavit, the evidence does not suggest the existence of such an agreement.

The district court inferred the existence of agreement between Lambus and the parole officers for a shorter GPS monitoring period in part based on the fact that the DOCCS May 8, 2013 service order to the GPS monitoring provider gave a scheduled end date of November 8, 2013. However, we have seen no evidence that Lambus was shown that form, nor any evidence that anyone at DOCCS told him the monitoring would end on that date. S.P.O. Browne testified that GPS monitoring would seldom end on the date originally scheduled. (*See* Apr. 11, 2017 Tr. 167.) And Browne testified that his understanding was that Lambus would be on GPS monitoring for a "minimum" of six months. (Apr. 11, 2017 Tr. 112, 153-54, 161.)

Bureau Chief Parker testified that he and Browne did not discuss an expected duration for the GPS monitoring, despite Lambus's numerous requests for the tracker's removal. (*See* Apr. 10, 2017 Tr. 96.) The district court apparently credited Lambus's affidavit's assertion "that Chief Parker told [Lambus] he would only have the GPS on him for three to six months," *Lambus II*, 251 F.Supp.3d at 476

101

(citing Lambus Aff. ¶ 16), finding that there was such a "verbal" agreement, *Lambus II*, 251 F.Supp.3d at 477. But there was no testimony from Parker that he agreed with Lambus to end the GPS monitoring in six months. Asked at the hearing whether he had made that agreement with Lambus, Parker testified that he typically tells parolees that the need for GPS monitoring will be "evaluat[ed]" in three-to-six months. (Apr. 10, 2017 Tr. 94.) Parker testified that he "never discussed when it was going to come off." (*Id*. at 96.)

Further, the DOCCS policy on GPS monitoring--which the court read as stating that the duration of such monitoring would generally be from four to six months as a "maximum," *Lambus II*, 251 F.Supp.3d at 477--in fact does not state a maximum or use the word "maximum." That policy states that "[t]he duration of electronic monitoring participation will *generally* range from a period of four to six months," that the "duration" of GPS monitoring "will be determined by the Area Supervisor," and that "[o]nce electronic monitoring enrollment occurs, the releasee will be placed on Intensive Supervision for a *minimum* of six months from date of enrollment." (Policy and Procedures Manual, Electronic Monitoring at 2 (emphases added).)

102

Scanlon was not privy to the initial decision to place Lambus on GPS monitoring; but he testified that while in most cases six months would be a sufficient monitoring period, he viewed Lambus as a high risk parolee because of his "[g]ang involvement, his past history, and his apparent level of narcotics trafficking" (Mar. 15, 2017 Tr. 15), and that "individuals that [BSS] deems as high risk in the community . . . . would stay on [monitoring] indefinitely, until the maximum" expiration date of the legal period of supervision (*id.*). And indeed, on May 8, 2013, Lambus--more than two years before his period of release supervision was "scheduled to end on August 2, 2015" (Lambus Aff. ¶ 28)--signed a Special Conditions/GPS Monitoring Form ("Lambus GPS Acknowledgement") stating that the monitoring would "remain in effect *until the termination of my legal period of supervision*" (Lambus GPS Acknowledgement at 2 (emphasis added)). Accordingly, Scanlon's understanding was that the GPS monitoring of Lambus would continue "until *his maximum expiration date of August 2nd, 2015*" (Mar. 15, 2017 Tr. 29 (emphasis added)).

Finally, the existence of any supposed oral agreement that the monitoring of Lambus would instead last only a few months was foreclosed by the written provision that the GPS monitoring conditions would remain in effect "[u]nless otherwise amended[] in writing by the Division of Parole" (Lambus GPS

103

Acknowledgement at 2). As the written acknowledgement stated that GPS monitoring was to last from May 8, 2013, to August 2, 2015--*i.e.*, more than two years-- no oral agreement could validly shorten the period to just months.

In sum, Lambus was a parolee who, shortly after his release from prison, had sent a letter that was suggestive of ongoing participation in drug trafficking activity. Investigation ensued by State parole investigator Scanlon, whose duties included assessments of threat by parolees to the community, in part by determining whether parolees were engaging in further criminal activity, including drug trafficking. The suspicions sparked by the Lambus Letter were enhanced by surveillance, as Lambus was observed with persons known to engage in drug trafficking, was seen wearing gang colors, and was found to be in possession of large sums of money not explainable by his claimed employment. Lambus also violated conditions of his parole by missing certain curfews and being observed in the presence of former felons. Parole officials gave Lambus the choice of being charged with his parole violations, which could result in his return to prison, or being subjected to GPS monitoring until the end of his release supervision. Lambus chose the latter.

104

The State's parole investigative bureau having limited resources, Scanlon sought and received assistance from federal agencies to conduct a joint investigation of Lambus. The joint investigation, of which Scanlon was one of the leaders, resulted in, *inter alia*, a judicially authorized search--prompted by information provided by a federal source--which resulted in seizures of crack cocaine and drug paraphernalia from a location at which Lambus was present. Data generated by the GPS tracker on Lambus, which Scanlon shared with the federal agents, also facilitated identification of other locations for surveillance of suspected drug trafficking activity.

In finding Lambus's GPS monitoring unreasonable on the ground that it was prolonged, *see Lambus II*, 251 F.Supp.3d at 495 (citing *Jones*, 565 U.S. at 415, 430), finding him to have been given an unfair choice between wearing the GPS tracker or being formally charged with parole violations, *see Lambus II*, 251 F.Supp.3d at 498 (citing *United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004)), and likening his monitoring to a random search "to 'generate evidence for law enforcement purposes,'" *see Lambus II*, 251 F.Supp.3d at 495 (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001)), the district court relied chiefly on these cases that did not involve parolees. Yet, as New York has recognized, "in any evaluation of the reasonableness of a particular search or seizure the fact of defendant's status as a parolee is always relevant and may be critical." *Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34.

Considering the totality of the circumstances, beginning with Lambus's status as a parolee who from the outset was informed of and acknowledged conditions that limited his reasonable expectation of privacy, and who from nearly the start of his more-than-three-year period of release supervision raised reasonable suspicions that he was again involved in drug- trafficking activity, in violation of the terms of his release conditions, we conclude that the GPS monitoring of Lambus throughout the investigation jointly led by BSS had a reasonable and rational relationship to Scanlon's performance of his responsibilities as a State parole officer; and that Lambus, as a parolee who chose to be placed on GPS monitoring rather than be charged with parole violations and possibly returned to prison, and who acknowledged that the monitoring would occur 24 hours a day, seven days a week, until the end of his period of supervision, had no reasonable or legitimate expectation of privacy that was violated by such monitoring. We conclude that the GPS generated data should not have been suppressed.

## CONCLUSION

We have considered all of defendants' arguments in support of the decisions challenged on this appeal and have found them to be without merit. For the reasons stated above, the orders of the district court suppressing wiretap evidence and GPS-generated evidence are reversed.